## MARSAC *v.* DE FORD.

1. CANCELLATION OF INSTRUMENT—UNDUE INFLUENCE—CONTRACTS —DEEDS—BREACH—LIFE ESTATES.

In a suit to cancel deeds given by a grantor who died after the time of the hearing and who it was claimed was induced by fraud or undue influence to convey all his property to the defendants in consideration of support and maintenance, retaining only a life interest in the realty, *held*, to sustain the finding of the trial court that no improper conduct upon the part of the grantees was shown; also that the grantees performed their duty in relation to supporting decedent until he voluntarily left, and that no breach of the contract for maintenance was established.

2. SAME—EQUITY—DECREE.

In the decree of the trial court determining that the deeds made by the decedent in consideration of his support and maintenance for the remainder of his life were valid, a provision requiring the defendant to pay costs and expenses of his support, sickness and burial, during the time that he was absent from the home which defendant agreed to furnish, and making the amount thereof a lien upon the property granted by the deeds, *held*, to be an equitable determination of the respective contentions.

Appeal from Tuscola; Beach, J. Submitted November 17, 1914. (Docket No. 101.) Decided March 17, 1915.

Bill by Frank Marsac against Paul De Ford and Electa De Ford to cancel certain deeds and conveyances. Before his death complainant assigned his rights to William Marsac, who was substituted as party complainant. From a decree for defendants, complainant appeals. Modified and remanded for further proof.

*Lynn M. Johnston* (*Neil E. Reid,* of counsel), for complainant.

*Paul Woodworth,* for defendants.

STEERE, J. This suit was brought by the original complainant, Frank Marsac, to obtain cancellation of two warranty deeds given by him to defendant Paul De Ford each conveying the title to 40 acres of land in Wisner township, Tuscola county, Mich. The theory of this bill and alleged ground for relief are that the deeds were obtained for an inadequate consideration, through overpersuasion, undue influence and tempting assurances of a good home in complainant's declining years, at a time when he was ignorant of the true value of the property conveyed and did not fully understand the effect of said deeds, nor realize that he was absolutely conveying away his property in the manner they import; and, further, that an agreement then made by defendants, as a consideration for said deeds, to care for, support, and furnish him a quiet, comfortable home with them for the remainder of his life has been disregarded and broken. In their answer and proofs defendants freely admit such agreement to furnish him a home with them and to kindly provide and care for him during the remainder of his life, and positively aver that they did

so in letter and spirit until he left them without cause a short time before this suit was begun, while laboring under a delusion following a serious illness, and specifically deny in detail all misconduct and grounds of complaint charged against them. The suit was heard in the circuit court of Tuscola county on pleadings and proofs taken in open court, resulting in a decree favorable to defendants. Notice of appeal was thereafter duly given, but before said appeal was perfected the original complainant, Frank Marsac, died, having in the meantime conveyed and assigned all his rights and interests in the subject-matter of the suit to his brother William Marsac, who has been substituted as complainant.

The two 40 acres so separately conveyed lie adjacent to each other, composing a single 80-acre tract, which was purchased by Marsac in 1892 for $400, as he alleges. It was wild, low and somewhat swampy land in its natural condition, having upon it a limited amount of mixed forest growth, such as ash, cedar, maple, etc. He made no improvements upon it during the years he held title to it, but it has since been drained, cleared, and cultivated, proving to be fertile soil suitable for growing sugar beets, and has increased much in value.

The first deed in question was given on December 16, 1905, for a stated consideration of $1, Marsac reserving a life estate, and the second was given on July 31, 1906, for a stated consideration of $1,000, defendants at the same time giving back to him a mortgage on the same description for that amount. He was then some 75 or 76 years of age, but in good health and full possession of his mental faculties. On September 28, 1912, he released this mortgage, and defendants on the same day conveyed to him a life estate in the premises it covered.

Marsac and De Ford were both of the old French-

Canadian nationality and trained to the calling of fishermen. Neither was able to read or write. Marsac was a bachelor, about 82 years of age at the time of the trial. De Ford was 46 years of age, and was married in 1895, his codefendant being his wife. From young manhood Marsac had engaged, with varying energy and success, in the business of commercial fishing, mostly at different points around the shores of Saginaw bay, during all of which time he seldom saw or heard from his own kinfolks. He was living at the home of De Ford's parents at a fishing station when De Ford was born, and knew him all his life. After De Ford grew up he worked for Marsac in the fishing business, and later was in partnership with him for a time. They lived and worked together in close and apparently congenial relations for upwards of 20 years, and until shortly before commencement of this suit. The long story of their association and relations during practically the entire life of De Ford can be but scantily outlined here, only touching the points that may throw some light on this controversy.

Frank Marsac is described as a pleasant-mannered, kindly dispositioned old French fisherman, generally well liked by those who knew him. His parental home, where he grew to young manhood, was in Macomb county. His brother Daniel, six years younger, testified that when their mother died they were living together on a farm on the bay near Mt. Clemens, and after they had lived together as a family about 20 years Frank left and went to Bay City. His brothers became farmers in Macomb county, married, and raised families, while he continued unmarried and spent his life in the vicinity of Bay City as a shore dweller on the bay, changing his immediate place of residence from time to time as business interests or inclination suggested. He is not shown during his

long life to have been intimate with or particularly interested in any of his relatives. He twice visited his brother William in 35 years, had frequently seen his brother Daniel in Bay City some 30 years before, when Daniel worked there for a time, and Daniel is shown to have visited him five times in the 60 years since he left the old home. His mother tongue was French, which he claimed to talk and understand better than English. De Ford's father was of the same nationality, apparently a congenial associate of Marsac, who says they were no relation, but that he let Paul's father live on his place in Essexville, was himself there off and on, knew Paul since he was a baby, had built himself a shanty on the place and lived there when Paul was quite a boy, and hired him to work at fishing when he became a young man. When Paul De Ford was born Marsac was a middle aged man, with no family or settled home. He made his home with Paul's parents from time to time for many years, and later boarded with one of Paul's sisters.

This record as a whole discloses clearly that during practically Paul De Ford's entire life Marsac was more in touch with the De Ford family than his own, and more intimate with Paul than any of his own blood until shortly before this suit was begun. It also is plainly shown by direct and circumstantial evidence that both De Ford and his wife were personally attached to Marsac, made him welcome in their home, and treated him when with them as a member of the family. When they were married in 1895 Marsac, in company with a brother-in-law of De Ford named Willet, was running a fishery near the village of Caseville, on a shore fraction of land consisting of 12 acres, which Marsac had purchased from the United States government, and De Ford was in their employ. Thereafter De Ford's wife lived with him at the fishery, keeping house, cooking for the men,

etc. Having had some educational advantages, she also was able to be of assistance to them in keeping their accounts, and in other matters where the ability to read and write was helpful. Previous to this Marsac had lived there only a portion of the time, during the fishing season, but, as he himself states, about the time Paul was married he went there "to live all the year round." He thereafter continued to live at the fishery with the De Fords until 1908, when he went with them to the Hotel Smalley in Caseville, which De Ford then owned and ran, where he lived with them until March, 1913. Shortly after De Ford was married Willet withdrew, and Marsac ran the business for two or three years, keeping De Ford in his employ, after which they formed a partnership. Marsac's interest in and relations with the De Fords were particularly friendly, and in their nature paternal. It was early talked between them and understood that he should make his home with them the remainder of his days.

De Ford testified that while he was in Marsac's employ the business had not been profitable, his wages being in arrears between $700 and $800, and he was constrained to contemplate some other employment, but Marsac wanted him to remain and take an interest in the business for his back wages, and he did so; that the fishing continued poor and unprofitable, and Marsac, in 1892, offered him the fishery if he would take it and pay the debts they owed, which amounted to about $1,200; that the fishing was poor and unprofitable for a time thereafter and he was in financial straits, but later business improved at that station, and he did well, paying the debts and making improvements there at an expense of about $2,000. In the meantime he also homesteaded 120 acres of State land along the shore adjoining the 12-acre fishery site. In 1908 he traded the fishery, with its improvements, outfit, and business, for the Hotel Smalley in Case-

ville, and removed there, accompanied by Marsac. Marsac denies owing De Ford when the partnership was formed, making a general statement that he liked him well enough when they fished together, and they fished in partnership for about three years, but did not make anything; that Marsac lost money and finally turned the whole thing over to De Ford, saying:

"I had a debt over to Stockmeyer's, and Stockmeyer wanted to get his money and I gave the whole thing, nets and boats, to clear the business of the partnership debts."

From the time De Ford took over the fishing business in 1902 until March, 1913, he and his wife furnished a home to and cared for Marsac as a member of their family. That he was a congenial member of their household during these years, and that they treated him kindly, with manifestations of filial affection and regard, Mrs. De Ford as a housewife attentively looking after his comfort in their home, is not only their testimony, but that of all other witnesses in the case giving evidence upon the subject, except Marsac himself, whose chief grievance, as claimed at the hearing, was that they did not continue to furnish him a home at the fishery as before, but exchanged it for and moved to the hotel, where conditions were noisy and uncongenial, and he was not only neglected, but shortly before he left threatened, and his life endangered until he was compelled to leave. Upon that aspect of the case no one reading his testimony in the light of the undisputed facts and circumstances disclosed by the record can, in reason, question the correctness of the following conclusion by the learned chancellor who heard the testimony taken in open court and had the witnesses personally before him:

"The court finds that as a matter of fact the matter of complaint alleged in the bill, of ill treatment and unsuitable surroundings, arose from absolute delusion following an attack of la grippe. This is evident from

the fact that on the stand as a witness he persisted in asserting that certain happenings claimed by him to have taken place were real and true, and the testimony shows them to have been imaginary simply.

"The court finds that, while Mr. Marsac may possibly have been more contented remaining at the fishery with De Ford and his wife, if they had remained there De Ford would have been impoverished, the fishery could afford no income and no employment to De Ford, who had his own family to provide for, and that the removal to the hotel was practically without objection by Marsac, and before suit was commenced the hotel had been sold."

In February, 1913, Marsac, then 81 or 82 years old, suffered an attack of la grippe. Dr. Young, the family physician who attended him, states that before this sickness he was unusually bright and alert for a man of his age, and that as a result of his attack he suffered with melancholia, evidenced by delusions. These delusions, as testified to by numerous witnesses, were to the effect that he was neglected and misused, disturbed by riotous gatherings, composed in part often of law-abiding and leading citizens, who threatened and pursued him, tried to break into his room, threw him out of the house—and De Ford assisted them—that "somebody was going to do him some injury, or take something away from him, but he didn't seem to know who." Henry McAdams, a witness for complainant, thus describes his mental condition:

"During this sickness last spring, he would talk of things occurring around the hotel that didn't occur; I knew they had not. * * * Marsac once in particular told me somebody fell downstairs. I thought he imagined it. I also heard him tell, I think it was the day he left De Ford's, that people in the office were talking about having him arrested and taking his clothes away from him, something similar to that. I never heard any such conversation. I was around there right along in the office and the bar. * * * I recall the day he left. Mr. Marsac then said to Paul that he hated to leave Paul as bad as he would

his own boy. I says, 'Marsac, what makes you leave?' He says the boys there were talking about him and such things as that. I says: 'I don't think it, Marsac; I never heard anybody.' He said he was going to be arrested and his clothes taken away from him."

These delusions remained with him and were tenaciously reasserted by him when on the witness stand during the hearing of this case.

In behalf of complainant it is urged that these deeds should be set aside "because De Ford falsely concealed from Marsac the value of the premises and because De Ford falsely pretended to Marsac that his relatives did not care for him." When such false pretenses are claimed to have been made, Marsac had been living with De Ford and his wife for years. He was in full possession of his faculties, knew just what interest his relatives had taken in him since years before De Ford was born, and was in a better position than De Ford to know if any such representations were true or false. His relatives at that time had been informed of the arrangement to give De Ford this land for caring for Marsac in his old age, and it was freely told and talked of by all parties in interest whenever occasion suggested the subejct. It is not claimed De Ford misrepresented the value of the land or made any false statements in regard to it, but that he knew more of the development and enhancement of values in that locality than Marsac, and "falsely" did not tell him what he knew. It was yet wild and unimproved. Marsac knew what and where it was. It was burned over about the time he deeded the first 40 acres. De Ford testified that his brother-in-law sold an 80 acres adjoining with more timber upon it for $800; that he sold the timber on this tract for $440, giving Marsac half. He afterwards had it cleared, improved, and put upon a producing basis. Marsac had a life estate in the whole, and could control it while he lived, without disturbing the deeds here attacked.

It is also urged as a breach of the contract that defendants required "complainant, in order to receive the support agreed on, to live in a riotous place of public drunkenness, and De Ford becoming an habitual drunkard, and his consequent inability to give filial care and provide a home." We do not find that the evidence sustains these charges. The Smalley hotel was the best in Caseville, a $2 a day house, with modern conveniences. Marsac ate in the dining room with the other people, and had a good, private room, well furnished and lighted, with a window overlooking the river. Myrtle Duffy, an employee in the hotel for four years, described him as apparently happy before his sickness, "an agreeable man to get along with and a great favorite around the hotel," and stated that when Mrs. De Ford went away she used to tell them to be good to Frank, and they were. Fred Mitts, a witness for complainant, testified:

"I saw Mr. Marsac there almost every day. He was sitting in the office most of the time, talking with people, smoking and seemed happy."

This witness also said this "seemed to be a well-kept hotel." Numerous other witnesses testify along the same lines, and as before stated, none to the contrary except Marsac. He was comfortably clothed, occupied and amused himself as he saw fit, was supplied with money, having a small deposit in the bank, and usually carried some gold in a little bag which he used as a purse.

It is shown that there was a bar in the hotel which complainant's witness McAdams testified "was run as bars usually are," and "sometimes they got a little noisy." This same witness testified:

"I don't know how Marsac could be treated better— * * * he was a favorite about the place—by Mr. and Mrs. De Ford and all. * * * The relations between him and the De Fords seemed to be pleasant."

It is testified the bar was closed about 10:30 p. m. and there is no evidence of any trouble with the authorities as to the manner it was conducted. Mr. Cochran, cashier of the Caseville bank, testified:

"I am acquainted with the Hotel Smalley. It was a fair building when De Ford took it. It was steam-heated, a fair country hotel. De Fords ran the hotel as an average country hotel, and the bar fairly well."

It is also shown that De Ford drank, and at times to excess. Marsac testified that he at one time offered him $100 if he would quit drinking. De Ford, however, became ill in the fall of 1912, and as a result could not and did not drink at all for six or seven months thereafter. His drinking is not shown to have interfered with Marsac's support, nor is it shown that he treated him unkindly or neglected him. The details of providing for his care and comfort were always especially looked after by Mrs. De Ford, who was a favorite with Marsac, and even in his delusions he does not claim there was any change in her attitude towards him.

The refutation of these charges is, we think, found in what he said and did in September, 1912, after living in the hotel 4½ years. He then went alone to Mr. Cochran, the banker, an old acquaintance of 16 years, and consulted him privately, saying that "he wanted to fix his matters so that if anything happened to him, Paul would have what was left of his property, and not have any trouble with any of his relatives in getting the money," going on to explain about the previous conveyances and the $1,000 mortgage on the second 40, also stating he wanted it fixed so he would be taken care of as long as he lived. Mr. Cochran made some suggestions as to what might be done, and he went away. He also went alone to an old friend of 20 years' acquaintance named Green, who had been village president, and consulted him, telling what he desired to do. These interviews with responsible men,

in whom he had confidence, preceded by a couple of days his going to the bank with defendants and executing the release of mortgage in exchange for a life lease of the 40 acres, as before described. He took occasion to have his friend Green accompany them to the bank to act as a witness, explain matters, and see that everything was done as he intended. He thus, at that time, while apparently in full possession of his faculties, ratified and renewed the contract, indorsing their treatment of him and all that had gone before as to their supporting him and his compensating them. Green testifies that he then "seemed to be bright and alert, the same as I had always known him."

We think it convincingly shown that Marsac was well and kindly cared for by defendants during the years he lived with them; that they gave him no good cause for leaving, treated him kindly thereafter, soliciting him to return, and offering to pay his board and provide for his wants, in sickness and health, elsewhere if he so desired; in other words that they lived up to and fulfilled their contract to well care for him in the closing years of his life, so far as he would permit.

When the decree appealed from was rendered in the trial court, Marsac was yet living, making his home with his brother William, now substituted as complainant. It appearing that Marsac was averse to residing with defendants, the court, having found the contract was yet in force, decreed that De Ford should pay for Marsac's maintenance, so long as he preferred to live elsewhere, $15 per month regularly, and, in addition, for all medical attendance and other expenses which might reasonably be incurred in case of sickness, provide him with proper clothing and defray his funeral expenses in event of his death. This decree appears to have been duly settled after notice, and was filed April 25, 1914. We think that the court,

in sustaining the deeds and requiring De Ford to support Marsac elsewhere, if the latter so preferred, reached a right conclusion, and equitably decided the paramount questions involved. On May 9, 1914, complainants served notice of appeal from the decree. On May 13, 1914, the court, on its own motion, filed a supplemental decree, stating that the former decree did not fully provide for all matters at issue, and directed that defendant pay complainant, or his agent, $200 for his maintenance "from the date of leaving defendant's home until the present time;" also determining that the life lease to complainant covering the land in question was intended as security for performance on defendants' part, therefore giving the latter "the management and control of the land described in the pleadings." On May 19, 1914, after notice to counsel and against objection of complainant's counsel, the court ordered that the original decree and the supplemental decree "stand as the final decree in this cause." On what showing the award of $200 was made in the supplemental decree is not disclosed by the record. As to the other matters there mentioned we think the court reached a right conclusion.

Marsac died July 7, 1914. We think, as indicated in the original decree, that the cost of his maintenance, and all reasonable charges for clothing, medical attendance, nursing, and burial, covering the time he was absent from defendants' home after leaving them in March, 1913, should be borne by De Ford and made a lien upon the land here involved. Necessarily these have not yet been passed upon and fully determined by the trial court. The case will therefore be remanded for a supplemental hearing upon that question, which alone remains open, in which opportunity shall be given to the respective parties to present proofs, whereupon the court shall make such supple-

mental decree touching the amount due from De Ford for the support and care of Marsac by others as the testimony warrants and seems to the court just and equitable, declaring the same to be a lien upon said premises.

With these directions the decree is affirmed, with costs of this court to defendants.

BROOKE, C. J., and McALVAY, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.