SHELL OIL COMPANY, INC., *v.* MAMMINA.

SPECIFIC PERFORMANCE—FRAUD—LANDLORD AND TENANT—OPTION TO
PURCHASE—EVIDENCE.

> Plaintiff, lessee of gasoline station property, *held,* entitled to
> specific performance of provision of amended lease relative
> to purchase of premises at a stated price, where issue of fraud
> in the inception of the original lease was resolved in lessee's
> favor by trial judge who saw and heard the witnesses and
> trial court expressly declined to rule whether or not there
> was a mutual misunderstanding as to what the agreement
> amending the original lease did mean and evidence of fraud
> was not so clear and convincing as to justify reversal of
> trial court.

CARR and KELLY, JJ., dissenting.

Appeal from Berrien; Hadsell (Philip A.), J.
Submitted January 7, 1958. (Docket No. 8, Calendar
No. 46,759.)   Decided June 12, 1958.

Bill by Shell Oil Company, Inc., a Virginia cor-
poration, against Joseph Mammina and Ella Mam-
mina for specific performance of option to purchase
contained in lease.   Decree for plaintiff.   Defend-
ants appeal.   Affirmed.

*Joseph E. Killian,* for plaintiff.

*Gray, Gray & Globensky* (*H. S. Gray* and *John L.
Globensky,* of counsel), for defendants.

---

REFERENCES FOR POINTS IN HEADNOTES
3 Am Jur, Appeal and Error § 1163.

Kelly, J. (*dissenting*). Defendants' property, located at the corner of Main street and Fair avenue in Benton Harbor, was leased to plaintiff from May, 1941, to July 31, 1949. The lease contained the following option clause:

"At any time during the term of this lease, or any extension or renewal thereof, Shell shall have the option to purchase the leased premises, together with all appurtenances thereto, and all improvements and equipment thereon, for the sum of $18,000."

The lease also provided that plaintiff could extend the terms of the lease for an additional 5 years by giving "written notice to lessor of such exercise at least 90 days prior to the expiration of this lease."

Plaintiff failed to meet the 90-day provision but on July 26, 1949 (5 days before expiration of the lease), through 2 of its representatives, secured defendants' signatures to an instrument prepared by plaintiff and entitled "Agreement Amending Lease." This "Agreement Amending Lease" contained the following provision:

"The term of that certain lease  *  *  *  (describing it) and the time to exercise any option to purchase and option of first refusal contained therein, shall be and the same hereby are extended for a period of 5 years, beginning on the 1st day of August, 1949, and ending on the 31st day of July, 1954, upon the same terms and conditions as set forth in said lease except that, during such extended period, Shell shall pay as rent for the leased premises, in cash or by check to the order of lessor, a gallonage rental of 1-1/4¢ for each gallon of gasoline delivered into storage tanks on the leased premises;  *  *  *  provided, however, that the said rent to be paid by Shell shall be not less than $150 nor more than $225 for each full calendar month regardless of the number of gallons of gasoline actually delivered as aforesaid."

Between the fourth and fifth year of the extension (November 20, 1953, and again on December 15, 1953) plaintiff demanded that defendants furnish "a complete abstract of title" to the property and when defendants refused to comply plaintiff filed its bill of complaint (May 13, 1954) stating it had no adequate remedy at law and therefore prayed that defendants "be decreed to convey to plaintiff a good and sufficient deed." Defendants appeal from the decree of the circuit court for the county of Berrien granting plaintiff's prayer.

Defendants filed a sworn answer and cross bill alleging that they signed the lease and amendment, "but say they did so only under the circumstances hereinafter stated and upon the understanding that the option therein, being paragraph numbered 'Thirteenth' meant only that if defendants decided to sell said land during the period of the lease, * * * then plaintiff had the right or option to buy the same for $18,000;" that prior to the execution of said lease, defendants became indebted to the Farmers & Merchants Bank in Benton Harbor and secured the payment of such indebtedness by a mortgage to said bank on the parcel of land described in the lease, and such mortgage was in effect at the time of the execution of said lease; that the property had not been leased for a period of time before the present lease in question, and the bank, through its trust officer, Mr. Connell, was desirous of obtaining a tenant to secure its collateral; that through the efforts of Mr. Connell, Mr. S. Eddy, division manager of plaintiff, was contacted and defendant Joseph Mammina was notified to come to said bank where he met with Mr. Connell and Mr. Eddy; that "neither defendant had before this time seen the said lease, and did not know it had been prepared; that Mr. Connell did not read the lease * * * verbatim, but read parts and explained parts of the lease to defendant, Joseph Mam-

mina, in the presence and hearing of Mr. S. Eddy, so explaining the meaning or substance of each paragraph, and when he reached paragraph numbered 'Thirteenth' of said lease (option clause), he did not read it but explained to defendant, Joseph Mammina in the presence and hearing of Mr. S. Eddy that the word 'option' meant that if defendants offered to sell then plaintiff would have the first chance to buy the property for $18,000; that defendant, Joseph Mammina, then repeated in the presence and hearing of Mr. S. Eddy that defendants would not agree to sell but would agree that if they did decide to sell they would give plaintiff the first chance to buy for $18,-000; and again Mr. Connell stated to defendant, Joseph Mammina, in the presence and hearing of Mr. S. Eddy, that this language in the lease did not require defendants to sell but provided only that if they decided to sell during the period of the lease, then plaintiff had the first right to buy and at the price of $18,000; that it was then the duty of Mr. S. Eddy, agent of plaintiff in this matter, to correct such statement or explanation if that was not his understanding and he did not do so, and not having done so, plaintiff is bound by such explanation so acquiesced on [in?] by plaintiff's agent and representative; that defendant, Joseph Mammina, believed such was the meaning of the said 'option' clause and believed Mr. S. Eddy, plaintiff's agent, so understood it, and so believing and relying thereon, and because of so understanding that Mr. S. Eddy, agent for plaintiff so understood such was the meaning of said clause, and only because of such understanding, defendant, Joseph Mammina, signed such lease, relying on the explanation given him at that time in the presence and hearing of Mr. Eddy;" "that defendant, Joseph Mammina was born in Italy, and though he has learned to speak and write the English language, if language is simple, yet he does not understand legal

or technical phrases or words in that language, but which terms or language defendants believe, and charge the fact to be, were well known to Robert Connell and S. Eddy."

About 3 months after defendants' sworn answer and cross bill were filed, namely January 31, 1955, plaintiff, by its attorney, filed a reply and answer to cross bill. The attorney for plaintiff was not present when either the lease or the "Agreement Amending Lease" was executed and confined his statements to "information" and "belief." He did admit in said answer that Mr. S. Eddy was plaintiff's representative in executing the lease.

The pretrial conference memorandum filed by the circuit judge, Hon. Philip A. Hadsell, on April 26, 1955, contained the following statements: "Plaintiff's counsel requests a day certain for trial because of wide distribution of witnesses involved." "Case set as a chancery matter for trial on May 25, 1955."

When this chancery matter was called for trial, plaintiff did not introduce witnesses but decided to rely upon defendants' admission in the pleadings that they had signed the lease and the agreement of extension, which were set forth in said pleadings.

Defendant Joseph Mammina offered his testimony at the trial and reiterated the statements previously made in his sworn answer and cross bill. He testified:

"I was born in Palermo, Italy; came to America when I was 7 years old; couldn't speak English then; lived in Chicago about 6 months, then moved on a farm. I started school in November and quit about March because we helped on the farm, this was about 6 years; had no formal education after that time. Never had any experience with leases before I signed the Mobile Socony lease (the lease on the premises in question just previous to the Shell Oil Company lease), that lease and this lease were the first 2 in-

struments I had my hands on up to the time I never heard of an option."

In his testimony, defendant Joseph Mammina stated that another representative of the plaintiff company was present in Mr. Connell's office when he signed the lease, but stated that he did not know his name. He further stated that a Mr. Graves and another man, whose name he did not know, came to him with the request that he sign the agreement amending lease and that there was some discussion about rental terms; that Mr. Graves stated at that time " 'Tell you what we will do, the best we can do, we will give you $225 a month,' and then it was understood—I asked him again once more, 'We are not going to sell our place.' He said, 'Well, if you desire to sell it any time we should have first option of buying it,' that is the very word he mentioned to me at my office in the presence of the other man with him. I don't know his name either, 2 men there."

Plaintiff failed to exercise the option granted to it in the original lease and plaintiff's realization of this is perhaps best shown by the fact that it captioned the July 26, 1949, agreement as "Agreement Amending Lease." No testimony was offered to refute defendant's testimony. No explanation was made showing any unavailability of Mr. Eddy or Mr. Graves, or of the other 2 men who were with them at the execution of the first lease or the subsequent agreement. No explanation was offered, in spite of defendants' sworn answer and testimony, to explain away the words contained in the "Agreement Amending Lease," namely "option of first refusal contained therein," except plaintiff's statement in its brief submitted to this Court to the effect that plaintiff in drawing up the lease inadvertently selected a printed form that had these words contained therein and plaintiff did not intend them to be so included.

Defendants endeavored to introduce a letter they sent in answer to plaintiff's first request that they furnish title to the premises. The court refused such request but, after defendant Mammina's testimony, made the following observation: "I am convinced that Mr. Mammina possibly thought, probably thought, did think, let's put it that way, that the option that was contained in the first lease was a first refusal as distinguished from a straight option." The court further commented on the fact that possibly Mr. Connell thought so, and possibly Mr. Eddy thought so. Mr. Connell could not be called as a witness as he had died previous to trial.

This Court, by many decisions, has established the principle that specific performance is not a matter of right but is within the discretion of the Court, a discretion to be exercised according to the well-settled principles of equity as applied to the peculiar circumstances of each case.

In *Fisk* v. *Fisk,* 328 Mich 570, this Court stated that a suit for specific performance, being an equity proceeding, is heard *de novo,* and that the person seeking such specific performance has the burden of proving his case. In that case we further stated:

"Specific performance will or will not be decreed by a court of equity depending on whether or not equity will be accomplished under the peculiar circumstances of the particular case. *Snider* v. *Schaffer,* 276 Mich 92."

In *Kopprasch* v. *Stone,* 340 Mich 384, we held that the granting of equitable relief by way of specific performance is not a matter of strict legal right but rests in the sound discretion of the Court.

This being an equity proceeding, heard by this Court *de novo,* it does not present to us a record which allows us to agree with the trial court that plaintiff introduced proof necessary for the relief of

specific performance. In effect the record is such that we agree with the trial court that it is as plausible to believe that defendant, the banker (Mr. Connell), and plaintiff's representative (Mr. Eddy), understood throughout their dealings that they were all dealing for the rights of first purchase rather than a straight option to purchase. Such a conclusion does not involve the principle of fraud but rather a mutual misunderstanding as to what the agreement meant.

The rule is well settled in this State that in the interests of justice pleadings may be amended in this Court to the end that they may comport with the evidence. Defendants in their answer did not label or specifically set forth a defense of mutual mistake.

After filing this opinion defendants should be granted 15 days in which to file with this Court an amended answer specifically raising the question of mutual mistake.

Upon the filing of said amended answer, this case should be remanded with instructions to enter a decree in favor of appellants and dismissing plaintiff's bill of complaint. Costs to appellants.

Carr, J., concurred with Kelly, J.

Smith, J. Mr. Justice Kelly is apparently reversing the trial chancellor and directing that decree be entered in favor of appellants upon the ground that there was "a mutual misunderstanding as to what the agreement meant."

It is pertinent to observe that the trial chancellor expressly declined to rule upon this issue. The following portions of the record, among others, make this abundantly clear:

"*Mr. Globensky:* You just said the parties may be mistaken.

"*The Court:* I say that is a possibility; I'm not holding that because it isn't presented to me; I don't have to decide that question because the question I have to decide is whether or not the first option was procured by fraud and I am definitely of the opinion that it was not. And what is the interpretation of that option; that seems to me to be the only question presented to this court by the pleadings and this testimony.

"*Mr. Globensky:* As I understand, your Honor feels because of our prayer for any relief which equity can grant us, we have failed?

"*The Court:* Not to that extent. I would be willing to listen to arguments, but I understand that the general prayer for relief isn't as broad as to change the entire nature of the option. The drawing of a mutual mistake and a reformation of the instrument under these pleadings I don't think the court—I think it would be an abuse of discretion, even if I had discretion to exercise it.

"(Argument—not taken.)

"*The Court:* That is why I say I can't do it. If you were in court on your cross bill asking to have this first option reformed to become a first refusal as distinguished from what it is, then I could possibly find on the testimony as it is now that there was a mutual mistake. I'm not passing on it because in the first place this evidence undoubtedly would not be uncontradicted or at least the plaintiff would have cross-examined this witness on the subject. I cannot tell you what I would find as to whether or not there was a mutual mistake and that is the reason I cannot grant you relief under your general prayer to that end. I don't think this court would have any authority whatever in this proceeding and under the present state of the pleadings to say to you, 'Yes, there was a mutual mistake between the Shell Oil Company and the defendant having that option contained in the first lease, and therefore I

reform it to cover what they both thought or meant,' and I do not have jurisdiction to handle that sort of a transaction."

Thus the issue presented to the trial chancellor was one of fraud. Reformation of the instrument on the ground of misunderstanding was not prayed. The ground upon which Mr. Justice KELLY would direct the entry of a decree for appellants is a ground that appellants expressly disavow even pleading,* and upon which, it is clear from the above, the trial chancellor expressly declined to rule.

As to the merits, we cannot find proof of fraud so clear and convincing upon this record that we must reverse the trial chancellor. It is asserted in the pleadings, on the one hand, that appellants had "for many years been engaged in business and in the direction and management of corporate undertakings, and for many years operated and managed a large trucking concern that was doing business extensively throughout the midwestern States," while on the other that his understanding of what was going on is limited by the fact that he is able only "to speak and write the English language if language is simple." Where, between these extremes the truth lies, whether he is in fact a shrewd business man, fully aware at all times of what he is doing, or whether he is an untutored child of nature who, figuratively speaking, walked into the bank barefooted and was fleeced, would seem a determination peculiarly suited to the trial chancellor. He saw the witness on the stand, heard him speak, observed the fluency or hesitation of his replies, his comprehension (or lack thereof) of questions and issues, and, having so seen, heard, and observed, reached his decision. Upon a printed record that cannot re-

---

* "And we say frankly to this Honorable Supreme Court that we did not plead a reformation of the contract on the ground of mutual mistake." (Appellants' reply brief, p 15.)

flect much of what is required to pass upon this issue of sophistication versus simplicity, we are not persuaded of error.

Affirmed.   Costs to appellee.

DETHMERS, C. J., and BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.