McLEAN v. WORTMAN.

1. EQUITY—PLEADING—PRAYER FOR RELIEF.

The prayer of a bill of complaint must be divided into consecutively numbered paragraphs and specify the particular relief to which the plaintiff shall conceive himself entitled and may also contain a prayer for general relief (Court Rule No. 21, § 2 [1945]).

2. SAME—PLEADING—PRAYER FOR RELIEF.

Generally, the relief granted in a suit in equity should be limited to that supported by specific allegation and prayer of the bill (Court Rule No 21, § 2 [1945]).

3. CONTRACTS—BREACH OF CONTRACT FOR CARE AND KEEP—FINDING OF TRIAL COURT—EVIDENCE.

Finding of trial court that defendant stepdaughter and her husband had not breached their agreement with plaintiff to provide her with a home, care and keep at the farm which she had deeded to them and to take care of the necessary funeral expenses at her death *held*, proper, under evidence adduced in suit to set aside the deed.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4]  19 Am Jur, Equity §§ 226, 227.
[3]  12 Am Jur, Contracts § 389.
[5]  9 Am Jur, Cancellation of Instruments § 31.
Remedy of rescission for grantee's breach of agreement to support grantor.  112 ALR 670.

4. Equity—Pleading—Prayer for Relief.

Those who seek equitable relief may fairly be expected to give the court and the other side at least a moderately adequate clue of precisely what it is they seek and why.

5. Deeds—Setting Aside—Undivided Interest—Equity—Prayer for Relief.

Trial court's grant of an undivided half interest in farm which plaintiff had deeded to defendants, her stepdaughter and husband, in suit to set aside the deed on ground of alleged breach of defendants' agreement to provide her with a home, care and keep and to take care of the necessary funeral expenses at her death *held*, error, where, even if plaintiff had prayed for such relief, the record shows that defendants had not breached their agreement and there does not appear to be any compelling equities demanding the grant of alternative, but unprayed for, relief.

Appeal from Jackson; Simpson (John), J. Submitted June 5, 1958. (Docket No. 27, Calendar No. 47,551.) Decided September 9, 1958.

Bill by Millie Maxted, with proceedings on appeal continued in the name of Ella M. McLean, administratrix, against Frank Wortman and Mabel Wortman to set aside conveyance made in consideration of promise to provide a home during her lifetime. Amended decree for plaintiff granting an undivided one-half interest in property. Defendants appeal. Reversed and bill dismissed.

*Kelly, Kelly & Kelly,* for plaintiff.

*Haskell L. Nichols,* for defendants.

Voelker, J. Once again we must face the perennially vexing problem posed by an elderly and usually ailing plaintiff who has conveyed his or her property to others in return for their promise to provide support and a home and later has repented of the bargain and sought to set the transaction aside.

In March, 1950, the plaintiff Millie Maxted was a widow over 70; she lived alone on a run-down 60-acre farm in Napoleon township some 10 miles from Jackson; her husband (and father of the woman defendant by an earlier marriage) had died the previous December and their children had long since grown up and left the old home. Millie Maxted was lonely and not well. Besides her own 3 scattered children, she had a stepdaughter, the defendant Mabel Wortman, then in her late forties and married to Frank Wortman, the other defendant, some 2 years Mabel's senior. The Wortmans had had their ups and downs and Millie prevailed upon Mabel and Frank, who were renting furnished rooms, to come and live with her on the farm and take care of her and the place upon an informal arrangement that this would thus pay for their rent. Thereafter she felt a little better and that spring and summer took occasional trips visiting her other children in various Michigan communities.

In June, 1950, while visiting one of her children in Mt. Clemens she became desperately ill from a strangulated hernia of long standing. Peritonitis set in and she was rushed to the hospital for surgery. For days she hovered between life and death. She was convinced she was going to die. She did not. The hospital ultimately needed her bed and her own children had their problems and were not in a position to take her in. She sent for Mabel and Frank to come take her home. They came. She remained gravely ill for many weeks during which Mabel and Frank waited on her hand and foot, practically 24 hours a day. She kept a bell by her bed and used it often. Gradually she rallied, responding to their care, and, still thinking her end was near, had them call an attorney to draw papers implementing the transaction presently described. The attorney came and ultimately prepared a quitclaim deed of the farm

and other necessary papers conveying the furniture and furnishings and an old automobile, all of which she signed. A life estate was reserved to the grantor in the deed. She and Mabel and Frank also signed an accompanying agreement, pertinent paragraphs of which provided:

"Second parties in consideration of said agreement and transfers hereby agree to give and maintain a home for first party during the balance of her life, and to look after her, care for her, and see that her needs are taken care of so that she will have a home and be able to spend the balance of her remaining years in said home with good care to be furnished by second parties.

"Second parties further agree to take care of the necessary funeral expenses, if same have not already been taken care of, and to bury first party at the place of her request."

Millie Maxted underwent another operation in November, 1950, and she was again hospitalized in January and February of 1951, where she had still other corrective operations, and again was brought back to the farm and again cared for by the defendants, Frank and Mabel Wortman.

Despite her age and repeated surgery, Millie Maxted made a remarkable recovery. By the early spring of 1951 she had so far recovered that in April she left the farm and took several housekeeping jobs —staying at the farm briefly between jobs—eventually keeping house for a widower at Ellsworth for nearly 2 years, for which she was paid a salary in addition to her keep. She liked her last job and there are plain indications in the record that she also liked her employer and that they even considered matrimony. In any case she said she preferred to stay there rather than return to the farm. She worked for her last employer from November, 1952, until August, 1954. In the meantime the defendants lived

on at the farm, keeping it up and waiting for Millie's return. When Millie's employer died the Wortmans wrote her to come home.

Our record grows a little dim concerning the activities of the plucky Millie following the dashing of her matrimonial hopes by the death of the old gentleman for whom she had last kept house, but it is clear that on May 17, 1955, she filed her bill of complaint in this case. In it she alleged that she was living with a daughter in Mt. Clemens. She related the agreement with and conveyances made to the Wortmans. She then alleged nonperformance of their promises by the defendants in 3 particulars: that they had failed to provide her a home or support; had failed and refused to provide her needed medical attention; and had failed to keep the property in repair and pay the taxes. She alleged that she was destitute and was forced to live with a daughter in Mt. Clemens. She prayed for an injunction against conveyance by defendants, which was forthwith issued. She then prayed as follows:

"That the said deed to the said Frank Wortman and Mabel Wortman, husband and wife, dated July 25, A. D. 1950 and recorded in liber 532 of deeds at page 172, Jackson county records, be set aside, annulled and held for naught and that the defendants be required to surrender up the same to be canceled; and that they be forever restrained and enjoined from setting up or claiming any estate, right or interest in or to the premises described in said deed, and that plaintiff be decreed to be the owner thereof and entitled to the possession of the same."

This specific prayer was followed by the usual general prayer "That plaintiff have such other and further relief as is agreeable to equity and good conscience."

The defendants answered at length alleging, in substance, that they had performed their promises

and had always made a home for the plaintiff and still stood ready to do so; more quaintly, that when she was sick they had nursed her like a baby night and day and had doubtless saved her life; that during their stay they had improved the property in excess of $2,500; and that they were now 55 and 53 years of age and had forsaken gainful years of employment and the possible acquiring of a home elsewhere in changing their lives to come and take care of and make a home for the plaintiff when she was without care and near death.

A full-dress hearing was had before the chancellor below. In her testimony the plaintiff related a series of small bickerings and minor misunderstandings that had crept into her relations with Mabel and Frank. It was her claim, in part of her testimony, that she felt that they ought to have paid all her medical and doctor and other bills; that the Wortmans quarrelled and bickered between themselves and made her nervous; that Frank seemed to have a permanent grouch and sometimes drank and occasionally came home "tight;" that at one time defendants' married daughter and her husband had used plaintiff's bed; that in April of 1951 she needed new teeth and glasses and had to go out to work so as to pay for them; and that she last stayed at the farm in February of 1952. At one point, referring to the deed and other papers, she said she did not know what she was signing, but this was not seriously urged below or here and is no factor in this case, other testimony and the balance of her own testimony being completely at variance with any such claim, which was not pleaded in any case.

It is evident from a fair reading of her testimony that the gallant Millie's heart was not in her lawsuit. It seemed almost as though someone stood behind her driving her forward. (We may here anticipate a little and note that plaintiff's daughter from Mt.

Clemens was substituted as fiduciary plaintiff in Millie's place following the latter's death at or just prior to the changed decree, of which more presently.)

Thus, regarding her pleaded claim that the Wortmans had breached their agreement in failing and refusing to support her and provide needed medical attention, she had this to say: "The Wortmans didn't have any money, so why—why say anything about it?" The fact that she knew from the start that the Wortmans had no money and that she never really expected them to pay her medical and other personal bills is clearly spelled out elsewhere in her testimony. In fact it seemed rather to bewilder and irritate her that the lawyers should ask her such obvious questions.

Aside from her general categorical claim that the Wortmans sometimes bickered between themselves and made her nervous, she had little or nothing adverse to say regarding their deportment toward her. At one point she said of her stepdaughter's husband: "I never had any trouble with Mr. Frank Wortman." At other places she spoke of how well she got on with the Wortmans. At no place did she question their devoted care of her when she was so ill.

Regarding her reasons for leaving the farm she had this to say: "I did not leave because I was going to get married. There was talk about marriage, but I didn't leave on that occasion [for that reason?]. * * * The Wortmans wrote a letter and said I could [come?] back if I wanted to, but I liked this place where I was working at that time and wanted to remain there. That was after he died that they wrote, but up until then, I preferred to stay there."

Plaintiff's own daughter had this, in part, to say:

"My mother was in a very bad condition and she wanted to go home, and I asked her if she meant going home back out to Jackson, and she said, 'Yes'. And so I called Mabel and I explained to her the exact condition my mother was in and find out if she felt able to take care of my mother to come home. She wanted her to come home, and she was perfectly willing and able to take care of my mother."

Among other things, defendant Mabel Wortman had this to say:

"My husband and I have paid all of the taxes, all except the last one, and I have been tied up by an injunction since a suit was started. I was concerned in having her get well. I honestly believe that my husband and I religiously looked after her. I certainly never asked her to leave the farm. I begged her to come back. I asked her to come back. We drove her up north and she went up to see this man. I took her at her request to Mt. Clemens. Her 2 daughters and her son had other obligations, and it was her request to live at home, and we lived there, and I felt that it was her home and her place to be, and I still do. I don't know whether I ever told her that I would use my own good judgment in calling a doctor, but I did call a doctor whenever I saw fit, whether it was the middle of the night, or any time. There was times when she laid unconscious—perhaps she don't remember it—and the doctor was there. I couldn't give any person any better care than I gave her.

"She was in bed in a critical condition. The first 2 days she was home she did wait on herself, and then for several weeks after that, she didn't. That care involved 24 hours a day, and my husband and I gave her night-and-day care at home. I certainly never told her never to come home and I tried to get her to come, yes, and I have got letters where she said she knew I wanted her to come home, but she didn't want to. She wanted to be independent and work, and she didn't want to be put on the shelf. She

never said anything about paying for her teeth, and she went to work and bought new teeth, and she bought lots of things, lots more than I could buy for myself, that's for sure. She certainly did pay for having the papers drawn. She did make the statement that that was her home. She wanted it that way. She wanted to be free to come and go, and lots of times she left when I didn't feel she was in condition to be traveling. I certainly would like her back today, and I certainly would do everything possible to help her. I don't think she and I have ever had any cross words. She is my stepmother.

"We paid for very nearly all of the prescriptions that were filled, and there were many prescriptions filled. I did not pay the doctor. That was her doings. We didn't have an opportunity to pay them. I called the doctor when I saw fit. I figured she needed a doctor. We paid $70.78 for taxes for the year 1950 on March 1, 1951, as soon as we got the money from the income tax. The first 3 months she was there after the papers was signed, she was bedridden, and then she was in the hospital."

Frank Wortman testified, in part, as follows:

"Well, I never kept track of the material I put into the property, but I sure put a lot of material into it, and a lot of work. I bought the lavatory and made it easier for her. Whatever I done, I done for her. I put new linoleum on the kitchen floor, painted the inside and outside, fixed the back porch, which was falling down when I got there, put in a new dry well, fixed the plumbing, and improved the property by more than $2,500."

A daughter of defendants had this to say:

"I have been in the home, and she kept, grandma kept her pretty busy. I have seen mother cooking the meal and grandma would ring the bell and hurry her up if she didn't come right away. Mother would have to attend her and serve her her meals, and get the meals, and so forth. Mother was there constant-

ly. Her health was very bad when I went there. My grandma never complained to me that my mother wasn't doing everything for her. I never heard any complaint of any kind."

After briefly reviewing the facts and testimony the trial court dismissed the case and in its accompanying opinion had this, in part, to say:

"Now the sole question, as the court sees it, is: Should the Wortmans reimburse her for the doctor and hospital bills that she voluntarily paid herself? She knew her condition when she came to the Wortmans, and asked them to come and stay on the farm and make a home there for her. And, nothing was ever said that they should be required to pay these doctor and hospital bills. Nothing was ever shown that they had the means to do that. * * *

"Under all of the circumstances of this case, the court does not feel that at the time the instrument was drawn, the plaintiff ever expected the defendants to pay for the hospital bills that she undoubtedly knew that she would have to pay, and which she voluntarily paid, herself. While she was at the farm Mrs. Wortman gave her good care and she regained her health so that she could go out and go to work, which was all her own doing.

"Under the circumstances of this case, the court denies the relief asked, and, therefore, the bill of complaint may be dismissed."

Thereafter the plaintiff moved for rehearing on the ground that alternative relief should have been granted under its prayer. Thereafter the court filed another opinion as follows:

"This is a motion to reconsider the matter of allowance to the plaintiff. The plaintiff moved away from the farm and the defendants have not had her support. She has lived apparently in various places, and contract for her support, of course, could not be fully complied with. There is no question but

what the defendants have been ready and willing to help her, but apparently, she, being an old lady, and having ideas to go elsewhere, left the farm.

"Now the question before the court is whether the decree that was heretofore entered dismissing the bill should be reconsidered and amended.

"The court has given this matter a great deal of attention and feels that, under all of the circumstances, it should be changed to help pay for the care, funeral expenses, et cetera, of the plaintiff, so the court is ordering that a new decree may enter making this farm in the name of the plaintiff and the defendants, with an undivided equal share to the plaintiff and defendants. This will provide for compensation for all the defendants have been to, and also provide for the support of the plaintiff and for her last sickness and funeral expenses.

"A decree may enter accordingly."

Thereafter the court vacated the old decree and entered a new decree in conformity with its last opinion. This appeal has resulted.

We think the learned chancellor was right the first time and that the bill of complaint should have remained dismissed. In our view this result could and should have been reached on either of 2 grounds. The first is that the plaintiff neither alleged nor prayed for the kind of relief ultimately given. In this connection we note that our court rule (Court Rule No 21, § 2 [1945]) provides that "The prayer of every bill of complaint shall be divided into paragraphs numbered consecutively, and shall specify the particular relief which the plaintiff shall conceive himself entitled to, and may also contain a prayer for general relief." We assume that this rule means what it says, yet we seem to remark a growing tendency among certain segments of the profession to ignore the forepart of this rule and instead lean heavily on the last phrase as a presumably easy

substitute for excessive cerebration or careful pleading.

It is true that there is some authority in this State for the proposition that in a proper situation equitable relief may occasionally be granted although not specifically prayed for. Sometimes we have granted it here on our own motion. But more often we have held that the relief granted should be limited to that supported by specific allegation and prayer of the bill (see discussion and cases cited in Callaghan's Michigan Pleading and Practice, §§ 23.13 and 42.42). One of our latest utterances and holdings on this subject is found in *Shell Oil Company* v. *Mammina,* 353 Mich 9 at page 18.

In our present case the plaintiff chose to rest her case on the theory and allegations that the defendants had "wilfully" breached their agreement to provide her a home. Aside from her specific prayer for an injunction against alienation she asked for nothing less (or more) than that the deed be cancelled and set aside. The chancellor found—and properly, we think—that there was no showing of breach by defendants. He accordingly dismissed the bill. As noted, the plaintiff then moved for rehearing on the ground that the decree "should have provided for the alternative relief prayed for by the plaintiff." We find no such prayer for alternative relief, nor any amendment either to the body or prayer of the bill, and we do not think this case presents one of those comparatively rare situations where alternative relief should be granted despite the lack of a specific prayer therefor. This area of the law does not lend itself to dogmatism, but we think that those who seek equity may fairly be expected to give the chancellor and the other side at least a moderately adequate clue of precisely what it is they seek and why.

We prefer, however, to rest our decision on the larger ground that the chancellor below should not have given the plaintiff the relief he ultimately granted even had she specifically alleged her right to and prayed for the same. In saying this we are aware, as appellee suggests, that we have occasionally held that even where the setting aside of a deed in consideration of support for life is refused, because of lack of proof of breach, the decree in a proper case might nevertheless award alternative relief, such as a lien on the property as security for the performance by the grantee of his agreements. (See, generally, text and footnotes to 11 Callaghan's Michigan Pleading and Practice, § 85.39.) But it is not true, as appellee avers in her brief, that "Where the court found that, as a matter of fact, the grantees had not breached their agreement, the transactions were not cancelled or set aside, but the court, *in every instance,* required the grantees to pay for the support and maintenance of the grantors from the time the parties separated." (Emphasis added.)

In the first place it is unthinkable that it is the law of this State that a chancellor must in every case abandon all judicial discretion and out of hand grant such alternative relief to all plaintiffs who have otherwise failed to prove their main case. It is not only unthinkable but it happens not to be the law. Indeed in the usual case where no breach is proved no relief whatever is granted. Our reports teem with such cases. Alternative relief of any kind is granted only where there remain compelling and disturbing equities despite the lack of clear breach. The *McKnight Case* (*McKnight* v. *McKnight,* 212 Mich 318), and related cases cited by appellee for affirmance, in our opinion present residual and lingering plaintiff equities—which we do not here propose to calibrate—which are clearly not

present in this case. Only recently we have held (*Latowitz* v. *Tomaszewski,* 353 Mich 441) that upon our finding that no breach was shown below the entire relief there granted plaintiff had to be set aside. In that case the equity of the plaintiff's situation was arguably every bit as strong if not stronger than that presented here.

In the second place, even if the rule were that enunciated by appellee, that is not what the chancellor did in this case; instead he undertook to award the plaintiff a half interest in the farm. The question is: was he warranted in doing so? We think not. If he took this action in order to give the plaintiff security for future performance of the agreement—as has sometimes been done—we think she already had adequate protection and security under the life estate reserved to her in her deed. Further, it appears plain from her testimony that she did not want or ever intend to go back to the farm. Moreover, since she appears to have died at or just prior to the time of the new decree, her need for future earthly security appears to have fled, and the net result of the changed decree was to present strangers to the transaction with the gift of a half interest in the farm despite the chancellor's finding and declaration that the defendants had faithfully performed their undertakings. In effect it was to penalize the defendants for their devotion and diligence in having saved Millie's life and to reward those who had no part in that worthy enterprise. In fairness we should add that the record is not clear whether the chancellor was aware of plaintiff's death when he made the new decree. In any case we are reluctant to agree with the result.

We are aware that we usually, and properly, allow the chancellor a broad discretion in reaching his decision in cases of this nature. He is there on the

firing line and we are not. He sees and hears things that we can but sense. But here there is no dispute whatever on the moving facts. The chancellor properly found no breach by defendants. In essence the decision below boils down to this: despite performance by the grantees the reformation of a deed will be decreed simply because the grantor changed her mind. This strikes us as possessing dubious equity and as being equally dubious from the point of view of the soundness and security of conveyances and land titles. With all due respect to the obvious effort of the learned chancellor to be fair and just to all concerned, we cannot bring ourselves to agree with the result.

The decree appealed from must accordingly be set aside and the injunction dissolved. A decree may be entered here dismissing the bill of complaint, with costs to the prevailing parties.

SMITH, BLACK, EDWARDS, and KAVANAGH, JJ., concurred with VOELKER, J.

DETHMERS, C. J., and CARR and KELLY, JJ., concurred in the result.