McKNIGHT v. McKNIGHT.

1. CANCELLATION OF INSTRUMENTS — DEEDS — CONTRACTS—CONSIDERATION—EVIDENCE—SUFFICIENCY.

In a suit by a stepmother against her stepson and his wife to set aside a deed of her homestead to them and to cancel a contract by the terms of which she agreed to give to them all of her property in consideration for her care and maintenance during her natural life, on the grounds of inadequate consideration, undue influence, and failure to perform on defendants' part, the conclusion of the court below that plaintiff had not made out a case entitling her to the relief asked, *held*, supported by the record.

2. SAME—CONTRACTS—LIEN—SECURITY FOR PERFORMANCE.

*Held*, that, in addition to the lien upon the homestead as security for faithful performance on defendants' part, as provided in the decree below, plaintiff is also entitled to a lien on property defendants may own to the value of the personal property and money they received from her.

3. SAME—COSTS.

Since defendants acquired all of plaintiff's property, and as she has been living away from them for over three years, and they have thus been relieved of her support for that period, the question of awarding an amount to plaintiff for expenses or solicitor's fees is left open to the discretion of the lower court, on a proper showing; no costs to either party in this court being awarded.

4. SAME—REMAND OF RECORD.

A motion on behalf of defendants for remand of the record in order that it may be supplemented by further proof to the effect that at about the time of the submission of this cause in this court plaintiff voluntarily returned to defendants and is now living with them and being cared for according to the terms of the contract, contested on the part of plaintiff, is denied.

Appeal from Ottawa; Cross (Orien S.), J. Submitted October 8, 1920. (Docket No. 65.) Decided December 21, 1920.

Bill by Lucy A. McKnight against Thomas J. Mc-
Knight and another to set aside a deed and contract,
and for an accounting. From the decree rendered,
plaintiff appeals. Affirmed.

*Fred M. Raymond,* for plaintiff.

*Carroll, Kirwin & Hollway,* for defendants.

STEERE, J. On November 30, 1914, plaintiff Lucy
McKnight deeded to defendants the place upon which
she resided, consisting of 10 acres of farm land with
a dwelling house, barn and outbuildings upon it, lo-
cated near the village of Berlin in Ottawa county and
claimed to be worth approximately $3,000, gave them
a bill of sale of her household furniture and fixtures,
farm implements, tools, vehicles and other personal
property on the place, including a cow, some chickens,
hay, corn, feed, etc., transferred to them a note for
$2,000 secured by a mortgage given to her by one
Albert Hawley and wife, and some weeks later as-
signed to them certain stock in the Valley City Stone
& Gravel Company for which she had paid $750 about
two years before. The total estimated value of all the
property thus transferred to them is said to be be-
tween $6,000 and $7,000. This was done pursuant to
a contract in writing of like date, November 30, 1914,
entered into between the parties whereby, in consid-
eration for the above conveyance and transfers of
property, defendants agreed to abandon their own
home and move upon the property conveyed to them
by plaintiff, support, care for and provide her a home
there during her natural life, in consideration for
which she agreed to either convey her property, real
and personal, to them during her lifetime, "or provide
by will upon her death for the transfer of all such
property to the parties of the second part." The con-
tract concludes as follows:

"It is the express intention of the party of the first part that parties of the second part shall become possessed of all her property, either during her lifetime or upon her death, and to effectuate the same, party of the first part hereby agrees to execute a will in the event that all of the property now belonging or hereafter acquired by said first party, during her lifetime, shall not have been transferred by her, previous to her death, to parties of the second part."

An introductory recital of reasons for the parties entering into such agreement states:

"Whereas, party of the first part desires to live with the parties of the second part and have them care for her in her declining years; and, whereas, the parties of the second part are now residing on their farm in the township of Cascade, Kent county, Michigan, and to remove therefrom and abandon and break up their home and surroundings will be a great sacrifice and loss to them in order to comply with the request of the party of the first part; now, therefore," etc.

This bill was filed to set aside said deed and transfers of personal property, and for an accounting by defendants to her in relation to the same, on the grounds of inadequate consideration, deception, undue influence and failure to perform on defendants' part.

The case was heard on pleadings and proofs taken in open court. The relief asked was denied, but with a provision under the prayer for general relief that plaintiff should have a lien upon the real estate she conveyed under the contract to secure future performance by defendants, the court saying in part:

"The testimony shows, and it appears to the satisfaction of the court, that the plaintiff was fully competent to enter into the contract and make the instrument referred to in the bill of complaint, and that she did so of her own free will, that no undue influence was used to procure the same, and that the contract was a fair one, and for a valuable consideration, and that the defendants have complied with the terms of

said contract so far as the plaintiff would permit them to do so."

When the contract was entered into and transfers of title were made plaintiff was 65 years of age, without children or immediate relatives, widow of Thomas McKnight, Sr., to whom she was married about eight years prior to his death, which occurred November 6, 1914, and who was father of defendant Thomas J. McKnight. While it was interrogatively suggested by plaintiff's counsel that her husband Thomas McKnight had a life income from the estate of a former wife, he left no estate so far as shown. The property in question here came to her from a former deceased husband named Padden. During their married life she and her husband Thomas McKnight lived together upon the 10 acres in question which he cultivated and cared for until in the later years of his life old age made it necessary at times to have help.

When his father died defendant Thomas J. McKnight was 56 years of age, had been a farmer all his life living in Cascade township where he had owned and operated an 80-acre farm located 17 miles southeast of Grand Rapids, upon which he had lived both before marriage and with his family thereafter until they moved from it subsequent to his father's death in compliance with the agreement. He had been married about 23 years and his family consisted of himself and wife, defendants herein, and four children, the oldest and youngest being respectively 17 and 11 years of age.

After plaintiff married Thomas McKnight, Sr., defendants became acquainted with her. Friendly relations were established between the two families and, though living some distance apart, they occasionally visited each other's homes. Plaintiff testified that she and her husband visited defendants "about once or

twice a year and we got pretty well acquainted." That defendants "used to call me 'grandma' and my husband 'grandpa'; the children did the same." Defendant Elizabeth McKnight said: "She visited at our house once or twice a year and she would stay a week, or a few days, and I visited their home a little oftener."

Plaintiff was concededly a strong, healthy woman of well-balanced mind and clear understanding until she suffered a stroke of paralysis in April, 1914, stressed for her as a dominant element in her claim for relief. Its extent and lasting effect upon her, mentally and physically, are matters in dispute. She testified to remaining in bed but a short time after it occurred, that Dr. Chappell attended her and defendant Elizabeth McKnight was sent for and came, remaining about three weeks; that her right arm and speech were affected which made a difference since in her "mind and conversation," and during that summer, though she was able to be around and enjoyed walking, she was not able to work, nor since that time had she been as well as before. The physician who attended her was not called as a witness. Elizabeth McKnight and her husband, who also went over at the time plaintiff was stricken, testified she was sitting in a chair when they arrived, unable to raise her right hand, but was able to talk, and appeared glad to see them; that she talked with neighbors who came in, and told Elizabeth, who attended to the household affairs, what to get for dinner that day. Elizabeth remained with the old folks for about three weeks on that occasion, caring for plaintiff and the house. When she left plaintiff was getting along well, could walk around and comb her hair with her right hand.

While there is some conflict in the testimony as to the severity of the stroke, which some of the neighbors who saw her the next morning called "slight,"

and in the description of her condition at that time, the testimony of friends and neighbors residing in that community, who knew her best and saw her most often, is overwhelming that her mentality was not impaired, that she rapidly recovered, was around as usual that summer, visited friends and neighbors, talked intelligently and understandingly and, with the exception of a less clear articulation, was apparently soon in as good condition as before, or, as some of the witnesses stated, in as good condition as at the time they were testifying. During the summer she and her husband visited defendants' home and took their oldest daughter Geraldine, a girl about 16 years of age, back to stay with them for company and go to school. She remained with them until after her grandfather's death. She testified that her grandmother was all right and her mental condition good, the only noticeable result of her stroke being some trouble in pronouncing her words. She also said the old people seemed contented and happy together, and after her husband's death plaintiff seemed to feel very badly and was much depressed.

When the elder McKnight was stricken with his last illness, which terminated fatally within a week or 10 days, defendants went over there and Elizabeth remained with plaintiff until after her husband's death, while defendant Thomas returned to care for their home affairs, going back and forth several times until his father's death and burial, which took place in Cascade where deceased had formerly lived. Preparatory to the funeral plaintiff went with defendants to their home. After the burial Elizabeth went back to Berlin with her to stay a few days, and as plaintiff stated, "helped me clean up and fix matters in shape to live again. Then she went home."

It is defendants' claim and Elizabeth McKnight's testimony that at this time plaintiff renewed her

former frequently expressed desire to live with defendants, repeatedly proposing it and stating that she had no near relatives or friends upon whom she could depend, that Elizabeth was her favorite and she wanted to live with her, in plaintiff's old home, that she was no longer able to take care of it and herself, could not live alone, defendants were her choice and if they would move down there and take care of her in her old age she would make them a joint deed of what she had.

The testimony in this record is undisputed that the arrangement for defendants to abandon their home, plans and pursuits in the neighborhood and on their place where they had lived so many years, was on plaintiff's initiative and at her solicitation. This record is barren of any testimony by any witness of any proposal or solicitation to that end on the part of defendants or any one in their behalf. It was her proposals to Elizabeth which led up to it and so far as disclosed they together made the tentative arrangement. It was said by Elizabeth on cross-examination, of events before they went to have the papers drawn up:

"I had about all the talk that was had with her * * * my husband did not have any of that talk. I don't know of any one else who heard any of that talk. Her and I practically handled the whole deal. She done the talking, whatever she wanted to do, and I took her word for it. She said she was getting old and would like to have us come there and make a home. * * * It was her own suggestions and her own doing."

On cross-examination plaintiff was asked and answered:

"Q. Didn't you tell her a great many times that you didn't have any relatives, near relatives, and that you wanted her to take care of you in your old age?
"A. Yes, yes, I told her.

"*Q*. You even told her that before grandpa died?
"*A*. I don't think so.
"*Q*. That you think was after?
"*A*. Yes, after.
"*Q*. When you were telling her that, that you wanted her to take care of you in your old age, did you tell her what you would do if she would take care of you?
"*A*. Yes, I told her.
"*Q*. What did you tell her that you would do?
"*A*. I told her she could have that place."

These talks between the two women resulted in an agreement that they would go to the office of William F. McKnight, an attorney of Grand Rapids, brother of defendant Thomas and stepson of plaintiff, and have proper papers drawn up, if everything was satisfactory. The two women went from plaintiff's home to Grand Rapids together on November 30, 1914, defendant Thomas having been called by telephone to meet them at the office of William F. that day. He reached the office about an hour later than they did. They spent the forenoon after their arrival and a portion of the afternoon that day at the attorney's office. The papers were signed there that day.

Plaintiff's contention in that connection is that she was then in such mental and physical condition as not to fully understand what she was doing, that the papers she signed were prepared before they got there without asking her any questions or consulting her, and she signed as told without their having been read to her and before they went out to dinner.

We think the evidence strongly preponderated to the contrary of this contention. Aside from the contracting parties, William F. McKnight, a young attorney associated with him named Dudgeon and Miss Gates, their office stenographer, were in the office. Attorney McKnight died some time before the hearing, and Dudgeon was in military service in France.

Up to that time Thomas J. McKnight had never talked to plaintiff about the matter. It was but a tentative agreement between the two women which he was a necessary party to and called there to ratify, if the proposed terms and details as related were acceptable to him. McKnight and Dudgeon had a suite of three offices in the Michigan Trust building, the main, or central, office and a private office for each of them. After the parties met at the main office they went into William McKnight's office and in reply to his inquiry as to what conclusion they had reached, plaintiff said she was going to give defendants a deed of her 10 acres, the Hawley mortgage and the "rest as they came due," except a mortgage given her by a Mrs. Molloy. They spent some time there with William McKnight. Defendant Thomas commented on the sacrifice the proposed change would require them to make, but ultimately consented to plaintiff's proposal. William McKnight prepared none of the papers but turned the matter over to Mr. Dudgeon, who came in while the parties were there and did the conveyancing, dictating to Miss Gates, who testified that she was in the main office and did not hear their conversations in the private office, but she saw William McKnight come out of his office and Mr. Dudgeon go in there; that later Dudgeon dictated the contract to her and she typed it, and he drew the other papers, consisting of a deed, assignment of mortgage and bill of sale, the parties going out to dinner in the meantime. That on their return in the afternoon the papers were ready and they went into Dudgeon's office where they were all read to them by Dudgeon, witness being present during the reading to act as a witness and, as she recalled, herself read to her, and took plaintiff's acknowledgment; that after the papers had been gone over, read to and signed by the parties, she and Dudgeon signed as witnesses; and plaintiff, who had several

papers in their office, left her copy of the contract with them for safe keeping.

Plaintiff denied that the papers were explained or read to her, claimed they were prepared before they got there in the morning and signed before they went out to lunch, that she thought "they said they would take care of me and we would all have a happy home." Asked who said that, she replied she thought it was William McKnight, but did not remember anything else he said that day. At first denying that she told William McKnight or Dudgeon what property she had or what she wanted to do with it, she later said she told them she was going to give defendants the 10 acres if they would come and take care of her; that they "talked this matter over, what we were going to do" soon after "Joe" (Thomas) McKnight arrived, and then went down to a hotel for dinner, after which they returned to the office. In the course of her cross-examination as to what she told the attorneys she was asked and answered:

"*Q.* You told them, either Will McKnight or Dudgeon, that you wanted Joe and his wife to have all of your property for taking care of you, didn't you?

"*A.* I don't think I agreed to give them all of my property.

"*Q.* Did you agree to give them most of it?

"*A.* Yes, the most of it. * * * The Molloy mortgage was for $950. I don't think I mentioned the Molloy mortgage to Elizabeth McKnight. I didn't mention that mortgage in Mr. McKnight's office there that day. The only mortgage I mentioned was the Hawley mortgage. I didn't mention any other mortgage or notes or certificates that I had. I kept the Molloy mortgage. I didn't mention any certificates of deposit in the bank. I had some that I didn't mention."

Soon after this the agreement was entered into, defendants broke up their home in Cascade township, held an auction and disposed of their stock, tools, farm

implements, furniture, etc., not needed at plaintiff's home, endeavored to sell or rent their farm without success at that time, and their immediate loss in that connection because of sacrifice sales, etc., amounted to about $1,500, as they testify. They then moved to plaintiff's place where they have since resided.

When they went there plaintiff told them to take charge of everything and do as they would with their own. In answer to Elizabeth McKnight's inquiries of her wishes as to household affairs she would tell her to do as she thought best and conduct them as she had done in her own home. She retained the bedroom she had always occupied adjoining the living room downstairs, which she describes as the best heated bedroom in the house, and remained with defendants as a member of the family for something over a year, well provided for and kindly treated, as not only defendants testify, but also immediate neighbors who were old friends and continued to visit her there. She had no household duties except as she dressed and cared for herself and her room, which she said she did "for pastime." She went and came as she wished, apparently enjoyed her meals and found no fault with the fare, took walks and visited her old neighbors, who also often visited her. They testified they were made welcome there and courteously treated by defendants. Thomas McKnight offered to, and when she wished did, take her in their conveyance wherever she wanted to go. Her washing was done for her and neighbors testified she always appeared neat and clean. So far as defendants knew, her wishes were gratified and wants supplied. She never complained to them, or found fault about anything. It is undisputed that she made known no grievance to them and had no known misunderstanding, words or disagreement with them up to the time she went away in January, 1916, but a little over a year after they had moved there. She

apparently liked the children, as she testified that they were "always kind and good to me." She also said that when she left "Everything was pleasant between Elizabeth and me. * * * I never had any trouble because I couldn't, * * * because I dasn't get excited." Elizabeth said of her:

"I always got her meals. She wasn't much of a burden, * * * She was easy to take care of. I got along with her all right. We never had a word. She was easy to provide for and didn't ask for anything. I made her a little clothing and washed and ironed for her and took care of her and treated her just like one of the family, * * * whatever she needed for her care and comfort and support my husband and I provided for her while she was there."

In January, 1916, she left home ostensibly on a visit to friends in Grand Rapids, without any intimation of other reasons for going or dissatisfaction with conditions in their home. At her request Elizabeth accompanied her to the home of the friend whom she proposed to visit. Since then she has remained away, except that at first she returned occasionally, was made welcome, ate and slept there, but soon left again. Elizabeth testified that she would ask when she was coming back and she would reply, "I haven't my visit out, I am having a nice time," etc., but gave no other reasons for her protracted absence. Plaintiff testified that she returned in the summer for clothing and remained a little while, was back several times but never intended to stay, and said of such occasions, "I was treated nicely when I went back there. I did not let them know when I was coming." After her visits home entirely ceased, and she continued away without communicating with them, Elizabeth wrote her inquiring when she would return, but received no answer. Plaintiff admitted receiving the inquiry and said, "I never wrote and told them the reason why I stayed at Grand Rapids so long." After an absence and silence

until the fall of 1917 she went there and demanded a return of her property. When asked on what grounds, she gave no explanation but, as she admitted, provoked at their refusal, replied, "If I don't get it by fair means I will have it by foul," and left. Thomas McKnight followed her down the road and talked with her, inviting her to return, which, he testified, she agreed to do. She, however, did not return, but engaged counsel and this litigation followed. Her reasons for leaving were largely generalities,—that she had "a wretched home * * * never was so unhappy in my life, there was nothing made pleasant or homelike for me, * * * I got so homesick and lonesome I just couldn't stay any longer," etc. When pressed to particularize she had no complaint to make of the husband or children, but confined her grievances to Elizabeth's sins of omission. She was not sociable as plaintiff thought she should be, would often only say "How" when she spoke to her, "never tried to make it homelike or pleasant at all for me" and on one occasion wanted her to give up her old bedroom and take one upstairs.

Elizabeth denied any intended discourtesy or neglect, or intimation from plaintiff that she was lonesome or discontented, said plaintiff always seemed pleasant and contented, no unkind words ever passed between them, and that she could only explain plaintiff's imputation of neglect to be sociable, as possible occasions when pressure of household duties intervened, and did not deny that she might at such times have even said "How."

The demand that plaintiff give up her room downstairs was, as first stated by her, an unkindness calling for more serious consideration. But this is denied by Elizabeth, who stated of the incident that plaintiff once remarked she would like a little bedroom upstairs, and after cleaning house in the spring she told

her that a bedroom was ready for her upstairs if she
cared for it and plaintiff said she did not, that witness
did not request her to make the change and there was
no misunderstanding or disagreement on the subject;
that her own room was and is always at her service,
and she never slept anywhere else while there.   On
cross-examination plaintiff verified this as follows:

"Q. Now, you spoke about a bedroom upstairs, and
let me ask you this: Didn't you suggest that you had
rather have the bedroom upstairs?

"A. I spoke of it just in fun because it was too
ridiculous for anything to ask an old crippled person
to go upstairs.

"Q. But you did speak of it?

"A. I did in a joke.

"Q. And after that then Elizabeth told you that if
you wanted to go in the bedroom upstairs that it was
all ready for you?

"A. Yes, sir.

"Q. And when Elizabeth told you the bedroom up-
stairs was all ready for you, did you say to her that
you wanted to stay down in your old bedroom?

"A. Why, certainly.

"Q. And it was all right, wasn't it?

"A. Why, certainly."

We find no occasion to disturb the conclusions of
the learned trial judge that plaintiff has not by a
preponderance of the evidence shown herself entitled
to the relief asked, but is entitled to security for full
performance by defendants of the express and implied
obligations which they assumed under the contract
they entered into.   Those obligations fairly imply not
only board, lodging, clothing, care and incidental
necessities commensurate with her customary condi-
tion and walk in life, but proper care, nursing and
medical attendance in sickness and suitable burial at
her death.

Plaintiff receives a pension as widow of her first
husband, Padden, and had some reserved resources at

the time the agreement was entered into, including the Molloy mortgage and bank certificates which she mentioned, the amount of which was not disclosed. She contends those resources are practically exhausted. At the hearing she testified that she had been paying her board while away, for three years past, and said in that connection:

"I am staying with a girl that I raised. She is married now and I have been staying with her and paying my board. I have been paying her $5 a week ever since I left my old home and wherever I went visiting I paid my way. I never looked for anything for nothing."

Whatever the reason, the fact remains that during the years of her absence defendants have not been burdened with any expenses or duties in her maintenance, while they have been in the full possession, use and enjoyment of the property and money received from her.

Since this contract was entered into defendants have sold their farm, but purchased a house and lot in Grand Rapids said to be worth about $2,500. In addition to the homestead they have received from plaintiff in securities realized upon, and other personal property, more than that amount. Under the facts disclosed by this record we think that, in addition to the lien upon the 10 acres valued at $3,000, security for faithful performance on defendants' part should be imposed as a lien on property defendants may own to at least the value of personal property and money received from plaintiff.

If it be subsequently shown that unkindly feelings between these parties have developed as the result of this litigation, or otherwise, giving rise to a situation where plaintiff cannot agreeably live in friendly home relations with defendants as contemplated in their agreement, it is within the power of the chancery court

to require that congenial provision be made for her care and maintenance elsewhere at defendants' expense. The following cases so authorize, and in certain other particulars sustain the conclusions reached in the case: *Cornell* v. *Whitney,* 132 Mich. 300; *Root* v. *Snyder,* 161 Mich. 200; *Marsac* v. *DeFord,* 184 Mich. 389; *Williams* v. *Williams,* 198 Mich. 1.

The decree of the lower court will stand affirmed, leaving open for subsequent consideration and disposition the questions of additional security, proper care of plaintiff in suitable environments, and any other matters which may subsequently arise not disposed of in this decision.

As defendants acquired by the terms of their contract all property plaintiff then owned or might thereafter acquire, and have been relieved of her support for a period of over three years, the decree will be without costs to either party in this court, leaving open to the discretion of the lower court, on a proper showing, to award plaintiff such amount, if any, for expenses or solicitor's fees as in the judgment of the court may seem just.

Since this case was submitted at the last term of this court and tentatively passed upon, a motion was recently filed in behalf of defendants for remand of the record in order that it may be supplemented by further proof to the effect that since or about the time of the submission of said cause in this court plaintiff voluntarily returned to defendants' and is living with them in her old home, where she expressed her wish to remain with them for the rest of her life; that she was made welcome and is now being cared for by them according to the terms of their agreement. The motion is contested by plaintiff, who shows by opposing affidavits of herself and counsel that she returned because of severe illness which she feared might prove fatal and a desire to die in her old home, and since has been

confined most of the time to her room and bed; that she expressly told defendants when she returned that she would not withdraw the case but abide by the final result and immediately sent for her attorney whom she so advised; that while she was consulting with him Elizabeth McKnight came into the room and told plaintiff in the presence of her counsel that if she did not drop the case she must leave their home; that plaintiff refused to abandon her case and does not desire to do so, but has instructed her attorney to proceed with it in this court.

In view of the disposition made of this case in the foregoing opinion this motion is denied, leaving the decree open, as indicated in such opinion, for further hearing and disposition by the lower court as circumstances may develop, and may be deemed by that court necessary, just and equitable between the parties.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.