W. T. BABER ET UX *v.* MYRNA HICKS, GUARDIAN

5-5197                                                455 S. W. 2d 104

Opinion delivered June 15, 1970

*James H. Pilkinton,* for appellants.

*Tompkins, McKenzie & McRae,* for appellee.

CONLEY BYRD, Justice. Appellants W. T. and Ruby Baber and appellee Myrna Hicks, Guardian of the Estate of Annie L. Christian, an incompetent, were previously before this court in *Baber* v. *Hicks,* 238 Ark. 674, 384 S. W. 2d (1964), relative to the validity of a deed from Mrs. Christian to the Babers for support and maintenance. Involved here is the Babers' responsibility to Mrs. Christian while she refuses to accept performance of the contract at the place designated or contemplated by the parties.

This phase of the litigation was instituted by the Babers for a declaratory judgment as to their responsi-

bility under the contract. Mrs. Hicks answered alleging that it was essential to Mrs. Christian's well-being that she reside and be cared for in Wilcox Hall, a nursing home operated in conjunction with a hospital in Kingsport, Tennessee, and that Myrna Hicks as guardian was entitled to recover $10,891.20 for the reasonable cost of supporting Mrs. Christian in the nursing home from December 31, 1965, to the time of answering and also the cost of medical expenses incurred since December 31, 1965.

The trial court after a hearing held that the Babers were liable for the medical expenses according to the standards at Hope, Arkansas, in the amount of $2,127.47 and that Mrs. Christian's estate was entitled to a reimbursement of $3,914.00 (being $10,265.00 less certain credits) for the nursing home expenses incurred. For reversal, the Babers raise a number of points, but because of our disposition, we will only discuss the obligation of the Babers with respect to the nursing home and the medical expenses.

The record shows that Mrs. Christian had lived with the Babers off and on from 1937 until late in 1962. When the Babers moved from Ozan to Hope in 1946, Mrs. Christian moved with them. Mrs. Christian owned some land worth approximately $22,000.00. In August 1962, subject to a life estate reserved in herself, she conveyed the land to the Babers under the following agreement:

"That I, Annie L. Christian, for and in consideration of the sum of Ten Dollars ($10.00) cash to me in hand paid by W. T. Baber and Ruby Baber, his wife, hereinafter called Grantees, the receipt of which is hereby acknowledged, *and the further consideration that they, and each of them, and/or the survivor of them, do hereby agree to take me into their home and the home of the survivor, and care for me and furnish to me a separate room in such home and also furnish and provide for me all my necessary food, meals and board, and generally*

*to support and look after and care for me as a member of their family as long as I live, except that I am to furnish and pay for my own clothing and wearing apparel. . . ."*

In December 1962, Mrs. Christian went to visit relatives in Tennessee and Virginia. Thereafter, Mrs. Myrna Hicks as guardian sued to set aside the deed because of alleged undue influence or mental incapacity. That litigation ended with *Baber* v. *Hicks,* 238 Ark. 674, 384 S. W. 2d 267 (1964), wherein we reversed the trial court's action in setting aside the deed, and said:

"Upon the record as a whole we are persuaded that Mrs. Christian's dissatisfaction with her contract is the result not of its invalidity in the first instance but of a change of mind on her part after she left the Babers' home. In setting aside the chancellor's decree we recognize, of course, that Mrs. Christian is still entitled to make her home with the appellants in accordance with the terms of the agreement."

On July 10, 1964, Mrs. Christian was admitted to a Tennessee Hospital for a fractured hip. On September 23, 1964, she was again admitted for urinary incontinence, urinary tract infection and bronchitis. Upon her discharge each time she was returned to the home of her niece, Mrs. Hicks, in Gate City, Virginia. On February 20, 1966, Mrs. Christian was again hospitalized with pneumonia, chronic cystitis, osteoarthritis, parkinsonism, and cerebral arteriosclerosis. When Mrs. Christian was discharged on March 15, 1966, she again returned to Mrs. Hicks' home. In April of 1966, Mrs. Christian was admitted to a nursing home operated in conjunction with the hospital. She was again hospitalized on April 11, 1967, and discharged on April 19, 1967, to the nursing home.

The guardian's pleadings assert that it is not congenial for Mrs. Christian to reside in a room in the

Baber home as a member of their family.

Mrs. Ruby Baber, age 64, testified she had lived at Ozan from 1937 to 1946 when they moved to Hope; that Mrs. Christian had lived in their home at Ozan and moved to Hope with them. Mrs. Baber's youngest son was five weeks old when Mrs. Christian came to live with them. Mrs. Baber is now working as a school teacher because she has nothing else to do. If she had Mrs. Christian she would quit and care for her and that she has offered to do that for four years and would now if Mrs. Christian was returned to her care. Mrs. Baber's mother is cared for by Mrs. Baber and her sisters in their respective homes from time to time. Mrs. Baber points out that she would employ all necessary help and assistance that would be needed to care for Mrs. Christian if she would return to her home. In fact, a Mrs. Bell McElmore, a registered nurse who lives just across the street, could be called on for help if needed. Mrs. Baber points out that her retirement income, if she now retired, would be $28 or $30 more a year than she is now drawing for teaching. On cross-examination she stated that if Mrs. Christian came back to Hope to live with her and the doctor said it was necessary for Mrs. Christian to live in a nursing home she would put her there until she could recuperate and come home.

Mr. W. T. Baber says that when they moved to Hope Mrs. Christian moved with them, that she's lived with them off and on some 18 or 19 years prior to the time she went to Virginia. He would be glad to help with Mrs. Christian if she would come to live with them as they had agreed; that Mrs. Christian lived with them as one of the family, in fact she helped rear their sons. On examination by the court Mr. Baber stated that if it was necessary to sell an interest in their lands to provide for Mrs. Christian's care, comfort and maintenance they would do so. He says the agreement between the Babers and Mrs. Christian was not entered into for money reasons, that it was out of personal love between Mrs. Christian and them.

Dr. Hobert M. Hampton of Gate City, Virginia, after testifying that he had recommended that Mrs. Christian be placed into a hospital initially and later transferred to a nursing home, stated:

"You have asked me if, at that time, after my examination, and with the knowledge I had of her condition, whether or not, in my opinion, Mrs. Christian could be properly cared for in a private home or residence, or whether it was best for her comfort, peace of mind and general and physical and mental condition that she be placed in a hospital or nursing home under professional care, and where hospital or nursing home facilities were constantly and readily available. This is a difficult question to answer, and in order to make some sense, I will go into some detail. She was initially admitted to Holston Valley Hospital on 7/10/64 with a diagnosis of fracture of the right hip. She was subsequently cared for by the orthopedic surgeons and myself during this hospital stay. Mrs. Christian's next admission to the hospital was 9/23/64. Reason for this admission was urinary incontinence with urinary tract infection, and bronchitis. She was subsequently treated by myself and Dr. R. C. Jones, a urologist, and discharged again to Mrs. Hick's care. The date of Mrs. Christian's next admission to the hospital was 2/20/66, diagnosis on admission was pneumonia, chronic cystitis, osteoarthritis, parkinsonism, and cerebral arteriosclerosis. She was again discharged home to the care of Myrna Hicks. Mrs. Christian continued to do poorly at home of Mrs. Hicks because of her urinary tract disease as well as crippling arthritis and it was decided to admit her to Wilcox Nursing Home. She was admitted in April 1967, mainly because she had developed some decubitus ulcers as the result of her bedfast condition, and due to her urinary tract infection required Foley catheter drainage as well and frequent care, such as irrigation, as well as antibiotics for the infection. Also she required very intensive care

for decubitus ulcers which were very slow to heal and required treatment at least 3 or 4 times a day by professional nursing care in form of medication, heat treatment, and turning every 2 to 4 hours in bed. It was felt by me that admission to nursing home was essential because of above conditions. Yes, my recommendations were borne out by subsequent condition of patient. Basically patient was unable to care for herself, could not turn herself in bed, or feed herself. Since she has been in nursing home, my visits have varied, sometimes every week or so, but of late I usually see Mrs. Christian every 2 or 3 months. I saw her last 2/9/69. The reason for my last visit was routine follow-up of nursing home care and physical evaluation, also to evaluate treatment instigated by an orthopedic surgeon several months ago in form of weights tied to her lower extremities to reduce flexure contractures of hips, knees, and ankles. *You have asked me if in my opinion should Mrs. Christian continue to remain in the nursing home, and to give my reasons for my answer. This question is certainly debatable, at least by myself.* She does require frequent and continuous 24 hour care, medication for parkinsonism and tremors, frequently turning in bed for delilitated condition, various cathartics, and sitting up in chair. Presently she is on leg straightening therapeutics of weights tied to lower extremities. I feel Wilcox Hall Nursing Home has done an excellent job. *Whether this could be done in a home I think would be very much up to the individual concerned with the care.* Since I first knew Mrs. Christian her physical condition had deteriorated in form of more serious, advanced, contractures of her joints. Nervous wise she is depressed at times but not to an incapacitating degree. Her mentation remains good. Medications I prescribed for her between December 1965 and December 1968 included antibiotics, Foley catheter drainage as well as irrigation of catheter, local medications for decubitus ulcers, tranquilizers for parkinsonism

and nervousness at times, heat treatment to ulcers, bed rest, turning in bed 3 to 4 hours, getting up in chair 3 times a day. The purpose of antibiotics was to clear urinary infection and occasional bronchitis and ulcer care was to clear up open ulcer, and the effect was good. It was imperative that above treatment and medication be administered and followed up by a doctor between December 1965 and December 1968. Mrs. Christian did not have any problems with medicines I prescribed for her. Having treated her for 5 years, I am acquainted with her phsyical, mental and nervous condition. *As to whether her continual treatment, her further treatment in the future is required to be in a nursing home, again is debatable as I mentioned before, for the reasons mentioned before.* The foreseeable care for patient for 1969, if she remains in nursing home, is same as it was in 1968. Unless she develops further infectious complications, antibiotics will not be needed. At present time she is not on any antibiotics. She does not have any urinary tract infection or any bronchial infection. *As to whether it will be necessary for her to have constant professional nursing attendance by an LPN or other similar type care, this again leads to a philosophy of patient care which is different in different families. I would leave it to the personnel involved to decide this on their own after they know the facts of the case. . ."* (Emphasis ours).

Dr. Jack L. Royal, a physician of Hope, Arkansas, stated that he had read Dr. Hampton's deposition and that assuming the conditions that Dr. Hampton had outlined are correctly stated, his opinion is actually the same as stated by Dr. Hampton and that is, it depends on motivation. He felt that if the motivation is proper, then with the conditions outlined in Hampton's deposition, Mrs. Christian could very well be taken care of in a private home. He said that he has seen patients with the same conditions managed beautifully in a home, and that knowing full-well that these con-

ditions were managed before nursing homes ever came into existence it is obvious that the only factor that would change things would be whether or not a person was motivated enough to keep Mrs. Christian in the home. Other testimony by Dr. Royal shows that it would be possible for a layman or laywoman to take care of a person in Mrs. Christian's condition as described by Dr. Holbert Hampton.

Dr. James W. Branch, a witness for appellees, after stating that Mrs. Christian was certainly a candidate for a skilled nursing home, stated on cross-examination that he had two nursing homes in Hope. However, he would not say as a matter of fact that a patient could not be cared for in a private home—*i. e.,* that it depended a lot upon the individual doing the caring and his training and motivation. He said that motivation is a big help to patients.

Mr. Charles W. Wilson of Hope, who has had 24 years experience in hospital and nursing home administration, testified that considering the information in Dr. Hampton's deposition he thought Mrs. Christian could be taken care of in a private home. He was familiar with Mrs. Baber's home and he thought it could be done. He knew patients with trouble similar to Mrs. Christian's who are being satisfactorily cared for from the patient's standpoint in private homes.

In a memorandum opinion the trial court found:

". . . Mrs. Christian, without justification, approximately four months after executing the deed, left the Baber home, never yet to return, and in all likelihood not to return for the rest of her life. The Court accepts at face value Plaintiffs' testimony that their contract with Mrs. Christian for her care and support was entered into by both parties in part to avoid the necessity of Mrs. Christian's ever becoming a nursing home patient. But this fact, in the Court's opinion, is not determinative of the rights and obligations of the

parties, now that that eventuality has occurred, even under such circumstances that have prevented the Babers to redeem their promise to Mrs. Christian to help her avoid a nursing home regime in her failing years. To hold that Mrs. Christian's departure from Hope, never to return, excused the Babers from all responsibility and liability for the cost of nursing home care for Mrs. Christian, no matter what her condition, would not only in effect work a forfeiture as to Mrs. Christian, but would also, in the Court's opinion, effect an unjust enrichment of the Babers in the premises.

In determining these parties' mutual rights and liabilities, the Court feels that all the facts and circumstances of the original transaction must be born in mind, including the circumstances of the parties at that time, and as such circumstances have been changed by the passage of time. In taking these matters into consideration and giving proper weight to all factors, the Court must then attempt to determine what the words of the deed now require of Mr. and Mrs. Baber in view of Mrs. Christian's needs as they have existed during the three year period in question.

The Court does not believe that the words 'as a member of their family' used in the support contract should be given the meaning that Plaintiffs suggest to the Court, that is, a meaning which would exclude Mrs. Christian from all benefits of the contract, since she herself removed herself voluntarily and without justification from the Baber home and from the family circle that had been created by the deed. To the contrary, the Court believes that this phrase requires the Court to determine how members of a family should react toward another member of the family who falls on evil days so that it has become, in the judgment of her personal physician, essential for her physical well-being to live in a nursing home."

As we view the record and the contract involved

the Babers at no time have breached their contract. Furthermore, their contract shows that it was to be performed by the Babers at their home. The agreement was that the Babers would "take me into their home and the home of the survivor, and care for me. . . as a member of their family as long as I live. . . ." Under these circumstances and the admission of the guardian that she does not consider the Baber home a congenial place for Mrs. Christian to live, it appears to us that the Babers are performing their agreement so long as they remain ready, willing, able and properly motivated.

A person has a right to contract to perform a contract in a particular place. IN THIS RECORD EACH DOCTOR WHO TESTIFIED STATED WITHOUT CONTRADICTION THAT WHETHER MRS. CHRISTIAN SHOULD STAY IN A NURSING HOME OR GO TO A PRIVATE HOME DEPENDED UPON THE MOTIVATION OF THE PERSONS IN CHARGE OF THE PRIVATE HOME. In this record there is no evidence to show that the Babers are not properly motivated. The overwhelming evidence is that they are willing to dispose of their total worldly possessions to uphold their contractual obligation to Mrs. Christian. Furthermore, the record shows that Mrs. Christian lived with the Babers for a substantial number of years, helped raise their sons, and that because of this enduring relationship the agreement between the Babers and Mrs. Christian was not solely a financial transaction but evolved in part from love and affection.

Thus so long as the record shows that the Babers are living up to their contract for furnishing the personal services for which they contracted and that it is possible for them to live up to their contract suitable to Mrs. Christian's condition in life, then we are at a loss to understand why they should be obligated to perform their contract in Virginia or Tennessee or any other place away from their home in Hope, Arkansas. Any other construction of the contract would permit Mrs. Christian, or her guardian, to select the site of performance of the contract.

In 17A C. J. S. *Contracts* § 357, it is stated:

"If the contract is silent as to the place of performance, such place is to be determined in accordance with the supposed understanding of the parties at the time of the contract, and hence, will vary according to the nature and subject matter of the contract. Such mutual intention or understanding should be ascertained in accordance with the general rules of construction taking into consideration all the facts and circumstances of the case."

In *Currier* v. *Currier*, 2 N. H. 75 (1819), the son had contracted with the father to pay the father's debts and to provide necessary support for him and his wife or in failure thereof to lease to them during their life fifty acres of the son's lands. The father lived with the son until his death but the mother refused to live with the son. In holding that the place of performance was the son's home, the court said:

"The pleadings put in issue only the fulfilment of the bond, after the death of the plaintiff's husband.

That issue has been properly found for the defendant, if he was not obliged to fulfill the bond, either to the plaintiff in person, or at such place as she might appoint. For, otherwise, the house of the defendant appeared to have been a suitable place for her maintenance, and his readiness to support her at such place, would be sufficient without an actual tender of any articles. (1)

This readiness and notice of it to the plaintiff, in A. D. 1809, were distinctly proved at the trial; and after such an unqualified refusal to remove, as she then gave, it was unnecessary to repeat the invitation since her husband's death.

We feel no disposition to doubt the correctness of the principle, that an obligation, which points out no place of performance, must be fulfilled to the obligee in person, wherever he may chance to be. (2).

But it is an established exception to this general principle, that when the obligation is not for money, but for articles which are cumbersome, 'as an obligation for ten bushels of wheat,' the wheat need not be delivered to the obligee in person, 'for that the importableness thereof, shall excuse' the obligor. (3)

. . .

Thus it must be apparent to every man acquainted with the business of real life, that a contract by a blacksmith to pay a certain sum in his work, when it was proved that he owned a shop in which he was accustomed to labor, ought and must have been intended to be performed at the shop of the promissor. While, on the contrary, if he owned no shop, and labored as a journeyman, and the promissee did own a shop, the inference would be, that the contract was to be performed in labor at the shop of the promissee.

. . .

The nature of the support to be furnished by the defendant in the present case, as it must consist of house-room, food, clothing, nursing, attendance, and other things necessary for the comfort of his parents, would make it as 'importable' as 'ten bushels of wheat.' Hence he was not bound to carry them to the obligee, wherever she might happen to dwell."

See also *Patterson* v. *Jones*, 13 Ark. 69 (1852), and *Ziegler* v. *Illinois T. and S. Bank*, 245 Ill. 180, 91 N. E. 1041 (1910).

The record shows that the Baber family have lived all of their lives in and around Ozan and Hope. We do not believe that either the Babers or the attorney representing Mrs. Christian in drawing the agreement ever thought that they would be called upon to perform

any personal services under this contract in Tennessee or Virginia.

To affirm the action of the trial court appellee relies upon *McKnight* v. *McKnight*, 212 Mich. 318, 180 N. W. 437 (1920). In that case the proof showed no actual breach of the contract by the obligors, but many incidents which went to establish a strained relationship. Without setting forth the exact terms of the contract, the court there affirmed the action of the trial court in refusing to set aside the conveyance, but clothed the trial court with authority to require that congenial provision be made for the care and support of the stepmother at a place other than the stepson's home. It also awarded a lien for security.

The holding in the *McKnight case* is not as favorable to appellee as she contends when it is construed in light of *McLean* v. *Wortman*, 353 Mich. 458, 91 N. W. 2d 811 (1958). In the latter case the agreement provided:

> "Second parties in consideration of said agreement and transfers hereby agree to give and maintain a home for first party during the balance of her life, and to look after her, care for her, and see that her needs are taken care of so that she will have a home and be able to spend the balance of her remaining years in said home with good care to be furnished by second parties.
>
> "Second parties further agree to take care of the necessary funeral expenses, if same have not already been taken care of, and to bury first party at the place of her request."

The trial court after finding that the second parties did not agree to pay medical expenses and that they had not breached their contract at first dismissed the complaint, but subsequently granted a rehearing and awarded one half of the property to pay for the first party's support while away from the second parties and for

funeral expenses. In reversing the trial court, the Michigan Supreme Court said:

> "In the first place it is unthinkable that it is the law of this state that a chancellor must in every case abandon all judicial discretion and out of hand grant such alternative relief to all plaintiffs who have otherwise failed to prove their main case. It is not only unthinkable but it happens not to be the law. Indeed in the usual case where no breach is proved no relief whatever is granted. Our reports teem with such cases. Alternative relief of any kind is granted only where there remain compelling and disturbing equities despite the lack of clear breach. The McKnight case *(McKnight* v. *McKnight,* 212 Mich. 318, 180 N. W. 437), and related cases cited by appellee for affirmance, in our opinion present residual and lingering plaintiff equities—which we do not here propose to calibrate—which are clearly not present in this case. Only recently we have held *(Latowitz* v. *Tomaszewski,* Mich., [353 Mich. 441] 91 N. W. 2d 809) that upon our finding that no breach was shown below the entire relief there granted plaintiff had to be set aside. In that case the equity of the plaintiff's situation was arguably every bit as strong if not stronger than that presented here."

From these authorities we conclude that the trial court erred in holding the Babers responsible for the nursing home care.

The medical expenses, to the extent that they do not exceed that chargeable in Hope, Arkansas, fall in a somewhat different category. The proof here shows that this was an item that the Babers expected to purchase or pay for as distinguished from an item that they expected to furnish themselves or through a unique arrangement other than that customarily used in the community. There are many arguments on either side of this issue, but in view of the fact that the Babers, notwithstanding Mrs. Christian's consistent refusal to

accept their personal services at the place where the Babers agreed to perform them, have a continuing obligation to offer to perform their end of the bargain, we believe that upon analysis the Babers are responsible for all necessary medical expenses so long as they do not exceed the comparable charge for medical expenses in Hope, Arkansas.

If Mrs. Christian while visiting a friend in Hope had broken a hip, we have no doubt but that the Babers would have been liable for the necessary medical expense. If Mrs. Christian had become miffed and removed herself to the same friend supposed in the first instance, there would appear no good reason why the Babers should not be liable for the medical expense. We can think of no reason why the same analysis should not apply with respect to medical expenses in Tennessee or Virginia so long as the cost of such necessary expenses does not exceed the cost in Hope, Arkansas, the expected place of performance. Since Mrs. Christian has by her conduct made only a part of the Babers' contract impossible of performance, it seems to us that the rule stated in Restatement of Contracts § 463 is applicable to those services which the Babers expected, under their contract, to purchase on the open market. Section 463 provides:

> "Where impossibility of performing part of the performance promised by a party to a bargain is of such character that if it related to the entire performance it would prevent the imposition of a duty or would discharge a duty that had arisen, and the remainder of the performance is not made materially more difficult or disadvantageous than it would have been if there had been no impossibility, the existence of duty is affected only as to that part; and if performance of the whole contract is possible with only an unsubstantial variation, the promisor is under a duty to render performance with that variation."

The Babers argue that the Chancellor erroneously

based his decree for money damages on what it cost in Virginia. The testimony of Dr. Branch was that the Virginia charges were comparable to those in Hope, Arkansas. Under these circumstances, we cannot say that the trial court erred in holding that the Babers are liable for the necessary and reasonable medical expenses.

Affirmed as modified with the costs to be divided between the parties.

HARRIS, C. J. & HOLT, J., dissent.

FRANK HOLT, Justice, dissenting in part. I cannot agree with that part of the majority opinion which disallows the chancellor's partial award of expenses to appellee for reasonable nursing home care which was based upon local costs. A portion of that part of the chancellor's opinion reads:

> "In arriving at this conclusion, the Court has taken into consideration the fact that nursing home care could be provided at Hope at less cost than the cost for similar care in Wilcox Hall, and that the wages of one employee by the Babers for forty hours a week during the two and two-thirds years Mrs. Christian has spent in the nursing home at Kingsport would possibly exceed the amount of the judgment here rendered in Mrs. Christian's favor. The Court has also taken into consideration the fact that Mr. and Mrs. Baber have been deprived of an opportunity to economize on costs, while at the same time considering the fact that Mr. and Mrs. Baber [68 and 64 years of age respectively] have not had the physical strain of giving the care that is properly Mrs. Christian's due."

Mrs. Christian, now 87 years of age, admittedly is an invalid and described as essentially a nursing home patient requiring constant nursing attention.

According to the evidence, had Mrs. Christian resided in the appellants' home during the period in question, it would have cost the appellants at least $5,280 for only one attendant working a forty-hour week. The minimum cost for nursing home care in Hope, Arkansas would have been approximately $7,500. This would not include any additional costs for necessary medicines and medical care in either the appellants' home or a nursing home. The total judgment rendered by the chancellor was for only $6,041. This included $2,127 for necessary medical bills which the majority approves. The balance of $3,914 was necessarily allocated to nursing home care. It appears both items were based upon local costs or standards. Obviously, that part of the judgment awarded for nursing home care is substantially less than the total costs would have been to appellants in providing either local home or nursing home care for Mrs. Christian during these approximately three years. I cannot see where this modest award, below local costs, is a substantial variation from the contractual duties of the grantees, nor disadvantageous to them.

The agreement between Mrs. Christian and the appellants provided, inter alia, that the appellants would: "* * * take me into their home and the home of the survivor, and care for me and furnish to me a separate room in such home and also furnish and provide for me all my necessary food, meals and board, and *generally* to support and look after and care for me *as a member of their family* as long as I live, * * *." [emphasis added] With reference to the words "as a member of their family," I agree with the chancellor's statement that: "* * * This phrase requires the court to determine how members of a family should react toward another member of the family who falls on evil days so that it has become, in the judgment of her personal physician, essential for her physical well-being to live in a nursing home." The chancellor's interpretation and resulting award certainly comport with a fair and reasonable meaning of how members of a family usually react when "evil days"

befall an elderly member.

These support contracts, by their very nature, invite controversy and often result in litigation distressing to both parties. In most every case it appears that the grantor is an elderly person who conveys his or her property in the belief that the grantee will reasonably provide security and comfort as the particular needs arise. The grantor rightfully trusts that the grantee will lessen and not add to the natural apprehensions of advancing age. The dreaded loneliness that so often faces an individual in declining years is a primary concern. In the nature of things, an individual, and particularly an elderly person, desires foremost to be with or near the loved ones of her family. This is especially true when members of a family show love and compassion for the elderly person.

It must be said this is a type of contract that is in a class by itself. These contracts are, and should be, liberally construed in favor of the aging grantor and if there is no exact precedent, then equity fashions a remedy. *Blose* v. *Blose,* 118 Va. 16, 86 S. E. 911 (1915); *Bruer* v. *Bruer,* 109 Minn. 260, 123 N. W. 813, 28 L. R. A. (n. s.) 608 (1909). See, also, *State Ex Rel* v. *Cate,* 236 Ark. 836, 371 S. W. 2d 541 (1963); *Bowen* v. *Hockley,* 71 F. 2d 781 (4th Cir. 1934); 27 Am. Jur. 2d, Equity § 103 (1966); and 30A C. J. S. Equity § 599 (1965). A court of equity looks into the circumstances under which a written instrument is made in order to interpret its substance and ascertain and enforce the real intentions of the parties. *Schnitt* v. *McKellar,* 244 Ark. 377, 427 S. W. 2d 202 (1968). And further, equity should never refuse relief merely because it finds no exact or similar situation in our own cases. *Renn* v. *Renn,* 207 Ark. 147, 179 S. W. 2d 657 (1944).

PERHAPS THE REMEDY NOW LIES WITH APPROPRIATE LEGISLATION TO AVOID THE HARSHNESS THAT SOMETIMES RESULTS IN THIS TYPE OF CONTRACT. BY STATUTE IN ALABAMA, THE GRANTOR IN A CONVEYANCE

OF REALTY IS GIVEN THE OPTION TO RESCIND WHERE A MATERIAL PART OF THE CONSIDERATION IS SUPPORT AND MAINTENANCE. CODE OF ALABAMA, TITLE 20, § 15. HOWEVER, THE GRANTEE, WHO HAS COMPLIED WITH THE TERMS OF THE CONVEYANCE, HAS THE RIGHT TO RECOVER ON A QUANTUM MERUIT BASIS FOR SERVICES PERFORMED IN CARING FOR THE GRANTOR AND, ALSO, BE COMPENSATED FOR REASONABLE PERMANENT IMPROVEMENTS TO THE REALTY. *McBrayer* v. *Smith,* 278 Ala. 247, 177 So. 2d 571 (1965).

In the case at bar the chancellor thoroughly, painstakingly, and wisely took into consideration the relative positions of the parties and I think his decree renders substantial justice and fashions an equitable result. I would affirm.

HARRIS, C. J., joins in this dissent.